LANHAM *v.* WRIGHT.

(Division B. May 23, 1932.)

[142 So. 5. No. 29883.]

J. A. Tyson, and O. L. Kimbrough, of Greenwood, for appellant.

4

6

**Osborn & Witty,** and **Gardner, Odom & Gardner,** all of Greenwood, for appellee.

Argued orally by **O. L. Kimbrough**, for appellant, and by **H. T. Odom**, and **F. M. Witty**, for appellee.

**Ethridge, P. J.**, delivered the opinion of the court.

The appellant, Miss Lilly Lanham, brought suit against the appellee, Frank A. Wright, for damages for a breach of promise of marriage. There was a verdict for the appellee, Frank A. Wright, in the court below, from which this appeal is prosecuted.

The appellant, Miss Lilly Lanham, testified that she became engaged to marry Frank A. Wright in February, 1924; that they had been associated together prior to that time and he had been calling upon her, and that they had fallen in love with each other, and that the engagement continued until between the 23d and 28th of May, 1927, when the appellee, Wright, declared his intention not to carry out the marriage contract and breached the engagement, giving as a reason therefor that he did not want to marry anybody, that he did not want to be tied up for life. The appellant testified that she remonstrated with him about his action and urged him to consider the situation she would be left in by reason of his long association with her, and by the fact that it would be known that the marriage contract had been breached, and that he had taken up a considerable portion of her life, etc.

The appellee, Wright, denied that he had been engaged to marry the appellant, and, of course, that he had not breached any contract of marriage.

It appears that, at the time of the beginning of the courtship and the keeping of company between Miss Lanham and Mr. Wright, she was about thirty-one years of

age, and Mr. Wright was fifty-six or fifty-eight years of age, there being considerable discrepancy in their ages.

Mr. Wright testified that he had been very much attached to Miss Lanham, and regarded her very highly, and had been in love with her, but, as stated, denied that he had ever been engaged to marry her.

It appears from the evidence of Miss Lanham that, at the time Mr. Wright proposed to her and desired to marry her, she was in need of medical treatment, having a throat that needed an operation and some nasal trouble, and that she suggested to Mr. Wright that it would be best, before marrying, for her to take the necessary treatment for her ailment; that Mr. Wright expressed satisfaction at this course and assisted her financially in taking the treatment, Mr. Wright being a man of considerable means, while Miss Lanham was without means except from earnings from her employment in a drug store. It also appears that she had the operation performed in Memphis, and, as her throat was in a rather bad condition, she was advised by her physician to go to New York and there take treatment from an eminent specialist named in the record, which she did, and in which she was assisted financially by Mr. Wright. During the time she was in New York taking this treatment she secured employment and paid a portion of her expenses. She was finally advised to go to Florida, as the climate there was more favorable to her than New York or Memphis, and she spent three or four months in Florida. Her testimony shows that Mr. Wright, while the engagement was pending, desired to dispose of some of his property, so that he could retire from business and travel, and he asked her with reference to her willingness to travel, and that she assented thereto, and that the marriage was postponed; and that it took considerable time for negotiations to dispose of his business property. She further testified that her relations with Mr. Wright, or rather their relations to each other, were splendid and affec-

tionate, and that she was devoted to him, being very much in love with him, and that he desired to buy her some diamonds, and especially a diamond ring, but that she did not care for diamonds, being, as she testified, a woman of simple taste, and as she expressed it, not a "diamond woman."

Mr. Wright denied offering her diamonds and a diamond ring, but, throughout his testimony, he expressed his appreciation of, and regard for, Miss Lanham, and admitted that he had been in love with her.

This, therefore, is a case where there is a direct conflict in the evidence as to the existence of the engagement to marry.

After the marriage contract was breached, as testified to by the appellant, and after their relations were terminated, Miss Lanham went to Chicago to take a secretarial course, and while there she wrote certain letters, some to Frank A. Wright, and some to other parties, which were admitted over objection. In addition to this, testimony was admitted of threats made by Miss Lanham against Mr. Wright of personal violence after the alleged breach of the marriage contract. Evidence was also offered that she admitted to certain parties, after the alleged breach of the marriage contract, that there had never been any engagement between her and Mr. Wright.

Of course, admissions that there had never been an engagement were competent. Miss Lanham denied making these statements or admissions that there had never been an engagement.

We have examined the letters admitted in evidence, written after the alleged breach of promise, and are of the opinion that they were not admissible, and that their admission constituted prejudicial error. In order for admissions or statements made after the breach of the contract to marry to be competent as evidence, they should have a bearing and probative value to prove the issues involved. They should have a direct and potential value

upon the relations of the parties at the time of the alleged breach, or prior thereto. An admission should possess the same degree of certainty as would be required in the evidence which it represents, and mere conjecture or suggestions as to what might have happened if the circumstances had been different are not admissible.

We do not see what light these letters would shed upon the issues involved in this suit. In a letter to General Keesler dated September 3, 1928, she made the statement that: ''I feel that I want to write to you to tell you that there is not a word of truth in the rumor which still seems to be going the rounds down there, about my suing Frank. I simply want you to know the truth, believing you to be my friend, as well as Frank's.'' This letter was written after the alleged breach of the marriage contract and prior to the filing of the suit. The letter further goes on to express appreciation and gratification that Mr. Wright was taking a higher social stand, and some of his associates were disapproved by the writer, and to deplore the fact that he had allowed himself to be drawn into low company, and also expressed the hope that Mr. Wright would find some lovely good woman and marry her, as the writer believed that in so doing he would make for himself a safer and happier place in the years to come. She also said that she would always love Frank, and that ''the memory of our friendship is too sacred to me to let any one else in ever.'' It further contained the statement that her heart was still bleeding from the fracture of its fondest tie, and stated: ''General, I believe that I am more charitable, more understanding and more sympathetic toward all the mistakes that flesh is heir to, and to life as a whole. Therefore, I suppose that suffering is an acid test for character, sure enough.''

This letter was inadmissible and was prejudicial. It does not matter what her idea was at the time the letter was written as to whether she would bring suit or not.

She proved by it her sincerity, but that did not affect her right to bring a suit. There is nothing in the letter, in our opinion, to show that there had been no prior engagement.

In another letter dated January 6, 1928, written from Chicago, to Frank Al. Wright, she took him to task for alleged association with common women. Some expressions contained in this letter would indicate that the parties referred to were of shady character. The following excerpt will indicate same: "Frank, I cannot believe that you are aware of Miss ————'s standing in Greenwood, and Miss ————— bah! Miss ———— with her dyed hair is just about as common as a woman gets to be. And Frank, if you knew the things she said about you up there at Goodman's in the presence of several persons, when she returned from market last year, I don't think you would be risking your reputation on her." Another expression in the letter is: "I cannot feel that you want to sacrifice your reputation by going with persons whose standing you know nothing about. Those 'old birds,' or should I say 'crows,' are after what little worldly goods they think you possess. Wake up! Go with real women, whom you will find very entertaining and charming." It also contains these expressions: "Believe it or not, I wish you would settle yourself and marry some real nice woman who would be good to you and make a lovely home for you. There are plenty of that kind down there. As times goes on, you are going to wish you had done this."

The expressions in this letter, hoping Mr. Wright would marry some nice woman, and expressing a desire for him to associate with good women, of course was calculated to prejudice the jury against the appellant, especially if the parties referred to as "old birds" and "crows" did not deserve this characterization as the letter implies.

The other letters all tend to show that, at the time these letters were written, the appellant, Miss Lanham,

was most solicitous of Mr. Wright's welfare. The expressions contained in said letters, however, do not indicate with any certainty, nor could any conclusion be drawn from them with any reasonable certainty, that there had not been a previous engagement between Miss Lanham and Mr. Wright.

It, perhaps, may take some time for unrequited love to change into hate. It may take some time for the sweet wine of love to turn into vinegar of hate, but it frequently does that. The fact, if it be a fact, that Miss Lanham should wish Mr. Wright well, and hope that he would marry well, is not, we think, inconsistent with the fact that she had previously been engaged to and expected to marry him herself. According to her view, he had breached this contract. Nothing had been held out, according to his evidence, to make her believe that Mr. Wright would change his attitude toward her. There was, therefore, little reasonable hope of a resumption of their engagement, but the expressions of affection in the letters might indicate the existence of a hope of such resumption.

In addition to admitting these letters, containing the matters referred to, S. R. Coleman was permitted to testify to threats of violence made by Miss Lanham against Mr. Wright prior to filing the suit, and subsequent to the alleged breach of contract.

We do not think S. R. Coleman's testimony, in any respect, is competent, but it had a damaging effect, or, at least, was prejudicial and liable to prove damaging to the plaintiff's cause before the jury. There is no suggestion in the testimony that affects the character of either of the parties, other than might flow from the bringing of an unmerited action on the one hand, or of the breach of a solemn agreement to marry after taking all the years of time during the marriageable age, on the other hand.

It is admitted by all of the counsel that the parties were of good character and high standing. See Miller

v. Hayes, 34 Iowa, 496, 11 Am. Rep. 154; Robertson v. Craver, 55 N. W. 493; Edwards v. Edwards, 93 Iowa, 127, 61 N. W. 413, and Rudd v. Dewey, 121 Iowa, 454, 96 N. W. 973.

In addition to what we have said, Miss Lanham had been examined at length about her statement to General Keesler, and the letters referred to, and as to the threats testified to by Sam R. Coleman. She had denied making the threats, and the effect of the admission of this evidence is an impeachment of Miss Lanham herself on matters about which a contradiction was not permissible. Williams v. State, 73 Miss. 820, 19 So. 826. In that case the rule is fully stated, and discussed, and it is held to be erroneous to permit a witness to be contradicted upon testimony not material to the issue.

In Tucker v. Donald, 60 Miss. 460, 45 Am. Rep. 416, it is held that much latitude is allowed in cross-examinations, and witnesses may be asked many questions that are irrelevant to the issue, but that it is not allowable to impeach the witnesses as to such matters. The rule, of course, is founded in common sense and justice. It would not be fair to contradict a witness about things that have no bearing on the issues.

Complaint is also made of the granting of an instruction for the defendant that the mere fact the defendant is a wealthy man does not entitle the plaintiff to recover, etc.; it being contended that singling out the fact that the defendant was wealthy is giving undue emphasis to one phase of the case. We do not think the instruction is subject to the criticism made. It is the law that the mere fact that a person is wealthy does not operate to allow a recovery. The liability, if any, exists from the facts, and not merely from the financial condition of the parties.

It is also complained that instruction No. 2, given for the defendant, is erroneous. That instruction reads as follows: "The court further instructs you that even

though you may believe from the evidence that the defendant was in love with plaintiff and desired to and would have married her, had it been agreeable to her, nevertheless, the plaintiff is not entitled to recover anything unless you believe, by a preponderance of the evidence, that there was, as set forth in plaintiff's declaration, an actual or express agreement to marry, and that defendant breached that alleged contract in the manner set forth in plaintiff's declaration.''

We do not see that this instruction is reversible. It is true, as a matter of law, that no action would lie merely from the fact that the defendant was in love with the plaintiff, and the plaintiff in love with him; and that he would have married her had it been agreeable to her does not authorize a suit for failure to perform the marriage. There must have been an agreement which could be established, and the mere existence of affection between the parties, and one party being agreeable to the marriage, is not enough, if this agreement had not been mutual between the parties.

The above instruction given for the defendant referred to the declaration for the hypothesis upon which the jury could rely instead of a hypothesis in the instruction itself. We have often condemned this practice. The declaration is usually couched in technical and complicated language. The facts of the case should be clearly and simply stated in the instructions, for the jury to more easily understand it, rather than referring them to the declaration to decipher the facts from it.

For the errors indicated, the case will be reversed and remanded for a new trial.

Reversed and remanded.