655 So.2d 37 (1995)
Johnny Ray JOHNSON
v.
STATE of Mississippi.
No. 91-KA-01262-SCT.
Supreme Court of Mississippi.
April 27, 1995.
*38 V.T. Vallas, Jackson, for appellant.
Michael C. Moore, Atty. Gen., Jean Smith Vaughan, Sp. Asst. Atty. Gen., Jackson, for appellee.
Before PRATHER, P.J., and PITTMAN and SMITH, JJ.
PITTMAN, Justice, for the Court:

STATEMENT OF THE CASE
In January, 1991, the Grand Jury indicted Johnny Ray Johnson for the crimes of simple assault on two law enforcement officers, J.K. Webb and Keith Burnett, while the officers were acting within the scope of their duties, in violation of Miss. Code Ann. § 97-3-7(a) (Supp. 1991). A joint trial was heard in the Circuit Court of the First Judicial District of Hinds County on November 20 and 21, 1991. The jury found Johnson guilty on both charges. On count one, Johnson was sentenced to serve a term of five years with five years suspended and three years probation. On count two, Johnson was sentenced to five years, to be served consecutively to the sentence in count one.
A motion for JNOV or in the alternative a new trial was filed on November 5, 1991. The trial court denied these motions on November 25, 1991.
Aggrieved by the findings of the court below, Johnson perfected his appeal to this Court and assigns the following as error:
THE TRIAL COURT ERRED IN ALLOWING THE JURY TO VIEW A VIDEO TAPE OF THE APPELLANT WHEN HE WAS BEING BOOKED INTO THE JACKSON CITY JAIL AFTER HIS ARREST.
Finding that the trial court properly admitted the video tape into evidence, this Court affirms the court below.

STATEMENT OF THE FACTS
The Defendant's brother was killed on New Year's Eve night. As a consequence, Johnson drank about four (4) forty-ounce malt liquor beers. Johnson became disorderly at his house, and his mother asked the reporters who were covering the story of the brother's death to call the police. Officers J.K. Webb and Keith Burnett responded and arrived at the Defendant's house.
By their accounts, Johnson came out of the house and assaulted the officers. Johnson was momentarily restrained until his brother, *39 Adam Johnson, freed the Defendant from the officers. Then, Johnson ran inside the house to his bedroom, all the while cursing and threatening "to fix" the officers. The officers testified that they believed he had gone for a gun; thus, they left the house. While the officers waited outside the house, the Defendant exited long enough to throw a glass pane at Officer Webb before retreating into the house. Later, Johnson again exited the house and encountered the officers under the carport. According to the officers, he was threatening them and had taken off his shirt as a sign that he was ready to fight. A struggle ensued during which the Defendant bit Officer Burnett in the right arm pit area and repeatedly kicked both officers. Officer Burnett was taken to the emergency room and received treatment for the bite wound which left a scar. The officers called for backup support since they were unable to restrain the Defendant alone.
The officers also testified that after they had handcuffed the Defendant, Johnson continued to resist arrest and kicked off his prosthetic leg. With one leg missing, Johnson continued kicking in the patrol car.
Witnesses for the defense included Adam Johnson and Louella Johnson, the Defendant's mother, and other friends who were present. All testified to a dramatically different story. Adam and Louella both testified to a much calmer Johnson on the day in question. Upon arrival, they testified that the police entered the house and went into the bedroom of the Defendant. They stated that the Defendant did not encourage an altercation in the carport and that the Defendant was trying to surrender when the police began assaulting him. Two other witnesses, Valerie Randall and Felishia Robinson, said that the Defendant came out of the house with his hands by his side.

DISCUSSION OF THE LAW

DID THE TRIAL COURT ERR IN ALLOWING THE JURY TO VIEW A VIDEO TAPE OF THE APPELLANT WHEN HE WAS BEING BOOKED INTO THE JACKSON CITY JAIL AFTER HIS ARREST?

Other Relevant Facts
Adam Johnson ("Adam"), the brother of the Defendant, testified that (1) the police officers entered the house while Defendant was in his room; (2) that the police left the house when Johnson would not come out; (3) that the Defendant surrendered to the police; (4) that the police then placed the nightstick around Johnson's throat; (5) that the officers never even tried to cuff the Defendant; and (6) that the police started the struggle.
During the cross-examination of Adam, the State asked Adam if he interfered with the police which Adam denied. Adam admitted that his brother called the police names but could not remember Johnson doing it more than once. Adam recalled that the Defendant could not have been kicking the police that night because they were beating him "real bad." Adam did not recall seeing his brother bite an officer. Adam denied telling the police that his brother was hysterical, only that his brother was drunk.
The State then asked if Adam was in the jail when the Defendant was booked. The following colloquy occurred:

BY ADAM JOHNSON: Yes, I was.

BY MS. HEWES: And are you saying under oath that he was not screaming at that time?

BY MR. VALLAS: Your Honor, I believe that that's separate and apart from the time that this melee took place. I know what she's trying to get at. We object to it. It's completely after all of this happened.

BY THE COURT: I'll let him answer the question.
.....

BY MS. HEWES: Do you remember him using any profanity then?

BY ADAM JOHNSON: He could have 
.....

BY MS. HEWES: And he was still kicking at police officers and still using screaming profanity, and he was still calling everybody an M.F. and trying to cause trouble then, isn't that right?

BY ADAM JOHNSON: He could have been doing that.

*40 BY MS. HEWES: Are you telling this jury yes or no under oath, Mr. Johnson?

BY ADAM JOHNSON: Well, yes, he was arguing. I don't know if that's what you're saying.

BY MS. HEWES: My question to you is, under oath, was your brother up there in jail handcuffed, with one leg, still calling everybody up there an M.F.?

BY ADAM JOHNSON: Ma'am, I don't remember him cussing, you know.
.....

BY MS. HEWES: If you saw a video of it, would it refresh your memory of it?
At this point defense counsel again objected to the line of questioning as irrelevant, and the court sustained the objection. The prosecution then asked:

BY MS. HEWES: Now I'm going to ask you one more time, Adam. Isn't it true that even after your brother had been subdued by more than five police officers, had been taken to jail, was handcuffed and he had one leg on at the time, he was still attempting to attack officers and still screaming "M.F." at everybody, in your presence? Is that true or is that not true?

BY ADAM JOHNSON: Well, it could happen, yeah.

BY MS. HEWES: I'm asking you yes or no.

BY ADAM JOHNSON: Yes.
.....

BY MS. HEWES: And you're trying to tell these ladies and gentlemen of the jury under oath that in front of his family and two police officers he was quiet and dignified and causing no trouble?

BY ADAM JOHNSON: No, I didn't say that, Ma'am.

BY MS. HEWES: The fact of the matter is he was causing a lot of trouble, wasn't he?

BY ADAM JOHNSON: I didn't say he was calm and everything. I didn't say that.

BY MS. HEWES: And you deny under oath telling Sergeant Glenn Davis that he was hysterical?

BY ADAM JOHNSON: No, I didn't say that either.
Adam later admitted that his brother broke free from the police and that he was resisting arrest.
Two witnesses later and after the defense rested, the State moved to show the video tape in rebuttal to the testimony of Adam Johnson "who simply could not remember whether or not the defendant used any profanity in the jail, and he simply could not remember whether or not he tried to strike an officer while in custody." The trial court recognized the video tape as impeachment evidence and found that:
it would be an unfair position for the Court to assume to disallow this particular evidence in view of the repeated testimony of all the witnesses for the defendant as to the demeanor and conduct of the defendant. I understand that we're talking about a somewhat different situation at some time, but it's certainly not so remote as to not be relevant. That, coupled with the fact that this tape is in fact in direct impeachment of one of the witness' testimony, compels the Court to allow it to be shown to the jury.
Officer Webb was recalled to the stand and the video tape played as he testified as to what was occurring.

Johnson's Contentions
On appeal, Johnson claims that the State intentionally asked certain questions of Adam in order to be able to admit the video into evidence for impeachment purposes. Johnson contends that the trial court was in error by: (1) erroneously assuming that the testimony of Adam Johnson was a denial that the Defendant was acting wildly and cussing while being booked; (2) erroneously finding that this testimony was not the truth and needed to be impeached of rebutted by the videotape; (3) erroneously finding that the video tape was necessary to rebut and impeach this testimony; and (4) erroneously finding that the probative value of this video tape, for the purpose of impeaching and rebuttal, would outweigh the prejudice and harm to the Defendant.

*41 State's Rebuttal Argument

The video tape was offered into evidence for the purposes of impeaching the testimony of Adam. The State asserts that the attack at the Defendant's house and the actions of the Defendant at the booking were close in time; and therefore, the subsequent acts of the Defendant at the booking were relevant (being one continuous temper tantrum). The State claims that the video of the booking went towards credibility of Adam's testimony. There being no clear showing of abuse of discretion, the State claims that this Court is to assume the lower court properly balanced the prejudicial impact of the video with its probative value.

Case Law and Analysis
"Impeachment is the process of discrediting a witness." See generally Ellis and Williams, Mississippi Evidence, § 4-1 (1984). Miss.R.Evid. 607 provides that any party may attack the credibility of a witness. There are several ways to impeach a witness' credibility including the showing of bias or prejudice of the witness or by attacking the witness' accuracy of recalled events. It does not matter which method is used to discredit a witness as long as the impeaching material is relevant to the issue at hand. Lanham v. Wright, 164 Miss. 1, 142 So. 5 (1932).[1] However, "[i]t is a well established rule that it is error to allow a witness to be contradicted on an immaterial (or collateral) matter. This is the rule in civil as well as criminal cases." Price v. Simpson, 205 So.2d 642, 643 (Miss. 1968).[2] Because the right of a party to establish a contradiction does not extend to collateral matters, Price, 205 So.2d at 643, this Court must determine if the facts and circumstances surrounding the booking of Johnson were "collateral."

The matters inquired into were not collateral.
The Price test for determining if an issue is collateral is whether the cross-examining party would be able to prove the matter in their case-in-chief. Id.
Even if the evidence does not pass the test set forth in Price, "[a party] ha[s] the right to contradict [a witness] and impeach [them] if in so doing he was attempting to show bias, motive, or intent as affecting the credibility of the testimony of [the witness]." Cranmer v. Baylis, 493 So.2d 977, 977 (Miss. 1986) (emphasis added). For example, in Clark v. State, 514 So.2d 1221, 1223 (Miss. 1987), the defendant complained that it was error for the trial court to exclude a witness whose testimony would contradict the previous witness. The state argued that the testimony was irrelevant because it went to the collateral issue of the credibility of the previous witness. Id. The Court found that the trial court erred in characterizing the testimony as irrelevant and stated further:
"The issue concerning [the previous witness] is not whether he has a character trait for being truthful, but, rather, whether [the previous witness] was telling the truth about the circumstances...."
Id. This Court similarly finds that the video tape was admissible for the purposes of addressing the credibility of Adam Johnson's testimony.
"If the witness denies the making of the statement or fails to admit it, for example by saying `I don't know' or `I don't remember', then the requirement of "laying the foundation is satisfied and the cross-examiner, at the next stage of giving evidence, may prove the making of the alleged statement." McCormick on Evidence, § 37 (John W. Strong et al. eds., 1992) Here, Adam denied that his brother was disorderly and claimed he could not remember portions of the event. Thus, the State was entitled to attack the testimony of Adam in order to show whether Adam was truthfully recalling the events.
A witness may be cross-examined on collateral circumstances which in some way *42 affect the transaction or event as long as these circumstances have some relevant relationship with testing the veracity, memory, bias, or accuracy of the witness. Prewitt v. State, 156 Miss. 731, 126 So. 824 (1930). In Prewitt, the Court stated:
It is of the utmost importance in the administration of justice that the right of cross-examination be preserved unimpaired. It is the law's most useful weapon against fabrication and falsehood. As a test of the accuracy, truthfulness, and credibility of testimony, there is no other means as effective. In this state, cross-examination is allowed coextensive with the issues, (citation omitted), not only, but it may proceed into the collateral circumstances surrounding, or in any way affecting the transaction to the full extent that they have relevant connection by way of testing the memory, accuracy, sincerity, interest, or bias of the witness. In all these matters the privilege of counsel rightfully has broad latitude, and, to make it fully effective towards the purposes for which the law allows and favors it, the privilege should not be interfered with or hampered or restricted by the trial judge, except in clear case of irrelevancy ... .
Prewitt v. State, 156 Miss. 731, 126 So. 824, 825 (1930) (emphasis added). The events depicted by the video tape are relevant to the accuracy of the testimony of Adam. Therefore, even if the events were collateral, this Court would still find that the video tape was admissible for the purposes of testing the memory, accuracy, sincerity, interest, of bias of Adam Johnson.

The video tape was relevant.
"The relevancy and admissibility of evidence are largely within the discretion of the trial court and reversal may be had only where that discretion has been abused." Roberson v. State, 595 So.2d 1310, 1315 (Miss. 1992) (citing Johnston v. State, 567 So.2d 237, 238 (Miss. 1990)). The trial court below found that the matters on video tape were relevant and we agree. We do not believe that the events were so remote as to be inadmissible.
In Howard v. State, 507 So.2d 58, 62 (Miss. 1987), the defendant asserted that the trial court erred by refusing to allow the defense to introduce a taped conversation into evidence where the conversation occurred prior to the alleged bribery. This Court found that the tapes were "totally irrelevant to the crime of bribery and the defense of entrapment." Furthermore, the Court noted the "remoteness" of the taped events to the bribery which occurred a month later. Id. The determination of whether an event is too remote to be admissible is addressed to the sound discretion of the trial judge. Higgins v. State, 502 So.2d 332, 335 (Miss. 1987). The decision of the trial court will not be reversed in the absence of clear proof of an abuse of discretion. Stewart v. State, 226 So.2d 911, 912 (Miss. 1969) (upholding trial courts decision to exclude threats which occurred six months prior to shooting). In McCormick v. State, the Court held that:
[c]ontinuous acts or a series of event, especially when closely connected in point of time, which ... are necessary or clearly helpful to a correct understanding of the main transaction  which tend to explain and elucidate the conduct and purposes of the parties  are as much of the res gestae as the direct act itself, and are admissible as a part of the transaction.
McCormick v. State, 159 Miss. 610, 132 So. 757, 757 (1931). We find that the arrest and booking of the Defendant in the case sub judice were continuous acts closely connected in time. After the testimony of Adam, the instance of booking the Defendant became necessary in order for the jury to develop a clear understanding of the Defendant's actions and his expressed attitude and the aggression of the Defendant. It cannot be said that the lower court abused its discretion. Thus, the video tape was properly admitted.

The video tape was probative.
Davis also complains that the evidence was more prejudicial than probative and should have been excluded on this basis. Miss.R.Evid. 403 is a filter through which all evidence must pass. Miss.R.Evid. 403 excludes certain relevant evidence if the prejudicial *43 effect of the evidence substantially outweighs the probative value. We find that Miss.R.Evid. 403 does not operate to exclude the video tape in the case sub judice.
Not only was the video tape relevant, it was highly probative of the Defendant's conduct. The conduct of Johnson was continuous, beginning at some time before his mother requested that a call be placed to the police department and lasting through the booking of the Defendant for assault. Due to the nature of this case, the video tape exemplifies the continuing conduct of the Defendant and firmly establishes the mental state of the Defendant. What better way could there have been for the State to prove the conduct of the Defendant than to show the video tape to the jury. With the probative value of the video tape substantially outweighing its prejudicial value, we find that the trial court properly allowed the video tape into evidence.

CONCLUSION
Miss.R.Evid. 607 allows any party to attack the credibility of a witness. Thus, bias and veracity which lie at the heart of credibility are always at issue. The videotape was properly admitted for impeachment purposes because it was relevant to the issue of credibility.
The matter inquired into was not collateral due to the nature of the testimony of Adam Johnson. While testifying, Adam Johnson significantly wavered in his recollection of the events. This created a question as to the veracity of Adam's testimony, and the video tape definitely had "some relevant relationship" to the testing of Adam's "veracity, memory, bias, and accuracy" of the events as he recalled, i.e., if Adam's recollection of the booking was faulty, then his recollection of the arrest might also be fault.
The prosecution had the right to inquire into or test the memory of Adam Johnson and lay a foundation for impeachment purposes. Violence was suggested by the line of questioning, refuted by the responses of the witnesses and properly impeached through the use of the video tape. Therefore, the video tape was admissible for the purposes of addressing credibility. Additionally, we are inclined to believe that the probity of the video tape was strengthened due to the nature of the offense and should have been admitted into evidence by reason of the fact that the conduct of this Defendant was continuous. Because the trial court did not abuse it's discretion in allowing the State to use the video tape for impeachment purposes, this Court affirms.
COUNT I: CONVICTION OF ASSAULT ON A LAW ENFORCEMENT OFFICER AND SENTENCE OF FIVE YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS AFFIRMED. SENTENCE OF FIVE YEARS TO BE SUSPENDED AND APPELLANT PLACED ON PROBATION FOR THREE YEARS.
COUNT II: CONVICTION OF ASSAULT ON A LAW ENFORCEMENT OFFICER AND SENTENCE OF FIVE YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS AFFIRMED. SENTENCE IN COUNT II SHALL RUN CONSECUTIVELY WITH THE SENTENCE IN COUNT I.
HAWKINS, C.J., DAN M. LEE and PRATHER, P.JJ., and JAMES L. ROBERTS, Jr., and SMITH, JJ., concur.
BANKS, J., dissents with separate written opinion joined by SULLIVAN and McRAE, JJ.
BANKS, Justice, dissenting:
Because I believe that the video tape of Johnson being booked at the jail was wholly irrelevant as to whether he committed an assault on the officers at the scene, I disagree with the majority's finding of admissibility.
It suffices to say that evidence is admissible only if relevant. M.R.E. 402. Relevant evidence is defined as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." M.R.E. 401. The assaultive actions for which Patterson was charged occurred at his house. *44 It is there that he allegedly kicked, bit, and otherwise assaulted the officers. Evidence relating to Patterson's conduct after he was arrested and in the confines of the jail has absolutely no tendency to make the existence of his actions at the scene of the arrest more or less probable.
Although the majority finds that Johnson's jail house actions were continuous acts closely connected in time to the arrest so as to be relevant, it is obvious that the prosecution did not think so; otherwise, the video tape would have been offered during the State's case in chief. Instead the State struggled, successfully as it turned out, to have the video tape admitted as impeachment evidence.
The video tape did not actually impeach any testimony during trial. During cross-examination, the prosecution, over objection, constantly pressed Johnson's brother Adam as to whether Johnson was kicking, screaming, and using profanity at the jail. Adam never denied this behavior. The following colloquy transpired:

By Ms. Hewes: Do you remember him using any profanity then?

By Adam: He could have 

By Ms. Hewes: And he was still kicking at police officers and still using screaming profanity, and he was still calling everybody an M.F. and trying to cause trouble then, isn't that right?

By Adam: He could have been doing that.

By Ms. Hewes: Are you telling this jury yes or no under oath, Mr. Johnson?

By Adam: Well, yes, he was arguing. I don't know if that's what you're saying.

By Ms. Hewes: My question to you is, under oath, was your brother up there in jail handcuffed, with one leg, still calling everybody up there an M.F.?

By Adam: Ma'am, I don't remember him cussing, you know.
Because Adam actually conceded that Johnson was arguing and could have been using profanity, there was nothing for the tape to rebut or refute. Thus, admission of the tape into evidence was clearly unfounded.
To the extent that the tape did impeach Adam's testimony, however improbable, it was impeachment on an irrelevant matter, to wit, Johnson's jail house behavior. In fact, when the prosecution inquired into Patterson's behavior at the jail, the court sustained defense counsel's objection based upon relevancy. Impeachment evidence must be relevant in order to be admissible. Carlisle v. State, 348 So.2d 765, 766 (Miss. 1977); Johnston v. State, 618 So.2d 90, 94 (Miss. 1993). Because Johnson's actions at the jail were irrelevant to his behavior at the time of his arrest, impeachment on this matter was improper.
For the foregoing reasons, I would deem the tape inadmissible and grant a new trial.
SULLIVAN and McRAE, JJ., join this opinion.
NOTES
[1] See also Miss.R.Evid. 401 which requires evidence to be relevant in order to be admissible.
[2] Miss. Code Ann. § 13-1-13 (Supp. 1994) reads:

any witness may be examined touching his interest in the cause ..., and his answers may be contradicted, and his interest ... established by other evidence.
This makes inquiry into bias or prior convictions relevant.