724 So.2d 1014 (1998)
Louis ALLISON, Appellant,
v.
STATE of Mississippi, Appellee.
No. 97-KA-00476 COA
Court of Appeals of Mississippi.
December 18, 1998.
*1016 Nathan Henry Elmore, Robert M. Ryan, Thomas M. Fortner, Jackson, Attorneys for Appellant.
Office of the Attorney General by Pat S. Flynn, Attorney for Appellee.
BEFORE McMILLIN, P.J., DIAZ AND PAYNE, JJ.
McMILLIN, P.J., for the Court:
¶ 1. Louis Allison was convicted of the forcible rape of RM, a former girlfriend. He has appealed raising two issues. We conclude that the issues are without merit and, therefore, affirm Allison's conviction.

I.

Facts
¶ 2. This case presents a classic instance of two people relating substantially different versions of events that occurred at a time when they were the only witnesses to those events. We will begin with the version related by the victim, who testified on behalf of the State.

*1017 A.

RM's Version of Events
¶ 3. RM was enticed to Allison's residence by representations that she had left certain items at the residence prior to the breakup of their romance. She went in the company of a female companion who waited in the car while RM reluctantly agreed to go into the house to retrieve whatever items Allison had called about. Once inside the house, Allison locked the door and became belligerent and threatening, suggesting that he would kill both RM and her companion. He physically assaulted her and forced her to disrobe and don a tee-shirt that had some prior significance in their relationship. In an effort to extricate her friend from danger, RM persuaded Allison to take the friend back home. All three individuals made the trip, and RM feigned her willingness to go back home with Allison in order to get her friend safely from Allison's range of control. Once back at Allison's home, Allison began a bizarre game with her that he called "three strikes," which involved him asking her a series of questions. If her answer to a question was unsatisfactory, she would receive "one strike." If she "struck out," Allison announced his intention to kill her. His first question involved an inquiry as to the identity of other men with whom she had recently been intimately involved. When she replied that there were none, Allison struck her a blow to the head. The physical assault continued and Allison forced her to engage in unwanted sexual intercourse.
¶ 4. Ultimately, it was discovered that she was bleeding from her vaginal area due to the forced sexual activity and Allison drove her to a hospital emergency room. Once within the safety of the examining room, RM reported the rape to hospital personnel and the police were summoned. Upon arrival, the officers arrested Allison as he waited in a waiting area and charged him with the crime of rape.

B.

Allison's Version of Events
¶ 5. Though he and RM were having some difficulties in their relationship, he was interested in trying to reconcile. He bought her a present, which he testified was a sexually provocative outfit commonly referred to as a "g-string" that RM could use in her work as an exotic dancer. Once she saw the gift, she decided to try it on and model it for Allison, which resulted in them both becoming sexually aroused. They engaged in an act of consensual sex, after which RM donned a tee-shirt and they both went out to take home RM's friend, who had been waiting in the car. After dropping off the friend, the couple returned to Allison's house where RM permitted Allison to make several photographs of her in the g-string outfit. They also engaged in additional acts of consensual sex.
¶ 6. When it was discovered that RM was bleeding in the vaginal area, the couple became concerned that she was having a miscarriage since there was some suspicion, though unconfirmed, that she might have been pregnant at the time. The discussion of her possible pregnancy led to an argument which became quite heated when the subject arose that, if she were pregnant, Allison might not be the father. Allison became so incensed that he physically assaulted her, but later regained his composure and took her to hospital to have the bleeding checked out. According to Allison's theory of the case, RM simply concocted the story of rape at that time in order to gain retribution for his admitted acts of physical abuse that followed the argument over her possible pregnancy.

II.

The First Issue: Denial of a Fundamentally Fair Trial
¶ 7. Allison urges that he was denied a fundamentally fair trial because the trial court repeatedly sustained the State's objections to evidence that was vital to flesh out his theory of the case, i.e., that RM had wrongfully claimed that the admitted acts of sexual intercourse were nonconsensual when, in fact, they were freely consented to by her. In advancing this point, Allison details fourteen separate evidentiary rulings by the trial court that he claims, in the aggregate, had the effect of thwarting any chance he had to persuade the jury that his version of the *1018 events was the correct one. Allison suggests that, since the real issue before this Court is the fundamental fairness of the conduct of his trial, rather than an assertion of the erroneous exclusion of some particular piece of evidence, the error rises to the level of constitutional proportions. Thus, he argues, we must assess the trial court's alleged errors under the more rigorous standard of being harmless beyond a reasonable doubt that applies to errors affecting basic constitutional rights. See Chapman v. California, 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).
¶ 8. We find this argument unpersuasive. After a review of each of the rulings complained of by the defense, we have concluded that the substantial part of the rulings were not erroneous at all. Others, even if conceded to be erroneous for sake of argument, were on minor points or related to issues that were fully developed for the jury's consideration through other means. An item-by-item analysis of each of the rulings at this point would only serve to distract from our discussion of the broader error the appellant asserts. However, in order to avoid the appearance that we have simply brushed over this issue, we have elected to briefly highlight each ruling in an appendix to this opinion.
¶ 9. The appellant seems to suggest that these rulings, when considered together, show a pattern that demonstrates the trial court's intention to thwart the appellant's efforts to fairly present his defense to the jury.
¶ 10. Without belaboring this point further, we conclude that these rulings by the trial court did not, by any stretch, rise to the level of prejudice necessary to deny Allison a fundamentally fair trial. A trial court, during the course of a vigorously contested criminal trial, is called upon to make countless rulings on evidence and to regulate the conduct of the attorneys appearing in the case. This is a most difficult job and often requires an almost instantaneous decision on what may be a close question of law. In recognition of this fact, the law does not hold the trial court to a standard of perfection, and a criminal defendant has no right to demand such perfection in the conduct of his trial. Peterson v. State, 671 So.2d 647, 655-56 (Miss.1996). Rather, the focus of an appellate court's review of the conduct of a trial is limited to the consideration of whether the trial court, by one or more of its rulings, has committed an error of such magnitude that the appellant has been denied a fundamentally fair trial. Id.
¶ 11. We also find no merit in the appellant's attempt to persuade us that we must consider the alleged errors in the trial court's evidentiary rulings under the "harmless beyond reasonable doubt" standard. We are satisfied that these multiple rulings complained of, even were all of them to have some measure of merit, do not begin to establish a fundamental unfairness in the conduct of this trial that would rise to the level of constitutional concern, whether that result is alleged to be an intended or unintended consequence of the trial court's rulings.
¶ 12. The appellant was given ample opportunity to fully develop his theory of the case, unhampered by any unwarranted interference by the trial court. The appellant's brief points to no proposition that the defense wanted to develop that it was unable to get fairly before the jury because of the trial court's improper rulings. The jury was, as we have already observed, presented with two equally plausible, but substantially contrasting, versions of the same events. The physical evidence developed in the course of the investigation of the matter and presented at trial was, in every instance, consistent with either version of events. Thus, this became a classic case for resolution by the jury as the finders of fact. Hill v. State, 659 So.2d 547, 552 (Miss.1994). The jury, fully acquainted with Allison's version of events, chose to reject it and accept, instead, the version related by the victim, RM. We are satisfied that Allison was not so hampered by the trial court in his effort to defend himself that he was denied a fundamentally fair trial. There is no basis to interfere with the jury's verdict on these grounds.

III.

The Second Issue: A Challenge to the Sufficiency and the Weight of the Evidence of Guilt
¶ 13. Allison argues that the evidence presented by the State did not have the requisite *1019 probative value to sustain his conviction. He urges, in an argument that blends the two concepts, that his conviction should be reversed and rendered because the evidence was insufficient as a matter of law to support a guilty verdict, or, in the alternative, that the weight of the credible evidence so favored a verdict of acquittal that, at a minimum, he is entitled to a new trial.

A.

The Sufficiency of the Evidence
¶ 14. In reviewing a challenge to the sufficiency of the evidence, we are required to consider all of the evidence and to view it in the light most favorable to the verdict. Yates v. State, 685 So.2d 715, 718 (Miss.1996). When there is a conflict in the evidence on any point, we must assume that the jury, as trier of the facts, resolved the dispute in favor of conviction. Jackson v. State, 614 So.2d 965, 972 (Miss.1993). This Court may interfere only if we determine that, viewing the record in this light, a reasonable and fair-minded jury could only conclude that the evidence on one or more of the essential elements of the crime was so lacking that a verdict of not guilty was the only proper result.
¶ 15. In this case, there was little conflict in the evidence regarding the essential elements of the crime. There was no dispute that Allison and RM engaged in sexual activity. There was no dispute that, at some point during the period they were together, Allison committed a relatively severe physical assault on RM, to the extent that physical signs of the assault could be documented photographically. The conflict exists primarily in RM's testimony that the sexual acts were not consensual, but that she submitted to them only after having undergone a physical assault and only for fear of suffering further physical harm. Allison, on the other hand, insists that the sexual activity was purely consensual and that the assault occurred after the sexual encounter as the parties argued over RM's possible physical involvement with other men. He claims that RM's allegations of rape were manufactured by her as a means of getting even for his assault on her. Despite Allison's evidence that contradicts the State's theory of the case, the State presented credible evidence that would support a conviction of the crime of rape. RM's testimony was not inherently incredible nor was she substantially impeached to the point that her testimony ought to be disregarded as a matter of law. In such a situation, the fact that there is plausible evidence in opposition to the State's case provides no basis to conclude that the jury's decision to convict was based upon insufficient evidence.
¶ 16. As to a claim that the verdict was against the weight of the evidence, the jury was confronted with two opposing versions of events, either of which was consistent with the physical evidence. In such a situation, our system of justice assigns the duty of resolving the disputed facts to the jury and not to the trial judge or to an appellate court. Groseclose v. State, 440 So.2d 297, 300-301 (Miss.1983). The authority for the court itself, whether at the trial level or on appeal, to intercede and upset the verdict of the jury is limited. The court is not permitted to substitute its view of which version of events is the more probable. McGee v. State, 569 So.2d 1191, 1194 (Miss. 1990). This Court must view all the evidence in the light favorable to the verdict. Id. Only if we are satisfied that the verdict has resulted in a manifest injustice may we set it aside as being against the weight of the evidence and order a new trial. Id.
¶ 17. The jury heard RM's testimony as well as the contrary version related by Allison. It observed these and the other witnesses first hand and made a decision as to which witnesses were more credible. In the exercise of its authority, the jury decided to accept the State's version of events instead of Allison's. There is no basis for this Court to conclude that Allison's version was substantially more credible than RM's, and there is, therefore, no basis for us to set aside the verdict as being against the weight of the evidence. The conviction must be sustained.
¶ 18. THE JUDGMENT OF THE CIRCUIT COURT OF HINDS COUNTY OF CONVICTION OF RAPE AND SENTENCE OF TWENTY YEARS IN THE *1020 CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE TAXED TO HINDS COUNTY.
BRIDGES, C.J., THOMAS, P.J., COLEMAN, DIAZ, HERRING, HINKEBEIN, KING, PAYNE AND SOUTHWICK, JJ., CONCUR.

Appendix A

A Summary of the Fourteen Evidentiary Rulings Complained of by the Appellant
(1) Defense counsel complains that he was not permitted to inquire as to the total number of times Allison and RM had engaged in consensual sex during their relationship. In the first place, the trial court did not sustain the State's objection on this point. Instead, it merely admonished the defense to "move along to the timeframe too." The evidence is replete with evidence of a long-term intimate relationship between these two parties. Even had the trial court cut off this search for a precise number of sexual encounters (which it did not), we do not feel that this would have fundamentally affected Allison's ability to present his theory of defense.
(2) Defense counsel was not permitted to inquire as to whether RM had, in the past, confronted other women and accused them of having sexual relations with Allison. The trial court is vested with broad discretion in the matter of judging the admissibility of evidence based on relevancy to the issue being tried. Johnson v. State, 655 So.2d 37, 42 (Miss.1995). We do not conclude that the trial court was manifestly in error in determining that this line of inquiry had little relevance to the proposition that RM accused Allison of raping her in retaliation for his recent physical assault on her.
(3) Defense counsel was admonished not to argue with RM when he attempted to contradict her about a statement she had made earlier in her testimony by telling her that she was wrong because he had written down what she had said. That admonition was proper and did nothing to deprive Allison of the opportunity vigorously cross-examine RM on this point or on any other relevant matter.
(4) The prosecution objected to the form of a question during the defense's cross-examination of RM, claiming that counsel had misinterpreted an earlier question by the State during its direct examination of the witness. The trial court did not rule on the objection and there can, therefore, be no error on this point.
(5) The court sustained the State's objection to an inquiry by the defense as to whether RM's friend knew whether the gift outfit was to be used by RM at her work. The witness had responded "I suppose." The State's objection that the answer did not appear to be based on personal knowledge was well-taken, beside the fact that the inquiry was on a trivial and largely irrelevant point.
(6) Defense counsel, while cross-examining RM's friend, inquired concerning "an understanding" that RM would go back to Allison's home after they dropped the friend off. The State objected on the ground that there was no indication that this witness had personal knowledge of any "understandings" between Allison and RM. That appears a perfectly legitimate objection and we can discover no fault in the trial court's decision to sustain the objection. Nothing in that ruling prevented defense counsel from pursuing the matter further to determine whether, in fact, this witness did have personal knowledge of any agreements between RM and Allison.
(7) Police Officer Walker was asked by defense counsel to verify the accuracy of information in a police report that he did not prepare. The trial court sustained an objection to that inquiry, and we find no error in that ruling.
(8) During cross-examination of Officer Walker, defense counsel asked an argumentative question concerning problems with the report prepared by another officer. The State objected and defense counsel withdrew the question before the trial court sustained the objection.
*1021 (9) Defense counsel asked Officer Walker, "So you looked at [the other officer's] report, but when I asked you questions about it you couldn't answer them?" The State objected to the form of the question and the objection was sustained. It is difficult to discover what relevant information a question in that form could have produced and we see no prejudice to the defense from the fact that this question went unanswered.
(10) Defense counsel asked another State's witness, "The State is using interviews and evidence that you collected in this case to prosecute this case; is that correct?" The trial court sustained an objection to the form of the question. Our view on this ruling is essentially the same as expressed in item (9) above.
(11) The defense called one police officer who had not testified for the State, primarily for the purpose of impeaching RM's testimony by showing that she had made statements to this officer shortly after the alleged rape that were inconsistent with her trial testimony. The defense appeared to be contending that RM had given inconsistent reports as to whether the physical assault that left her bruised had occurred before or after RM and Allison had taken RM's friend home. The State, in an attempt to show that there was no inconsistency in the statements, sought to demonstrate that RM had reported separate incidents of assault to the officer. Defense counsel interposed an objection on the ground of hearsay, which the trial court overruled. We agree with the trial court that the inquiry was permissible cross-examination to demonstrate that there was no inconsistency between RM's previous statements to investigating officers and her testimony at trial. The trial court was correct in ruling that the defense had opened this line of inquiry by attempting to impeach RM's credibility by inquiring into alleged prior inconsistent statements. Had the defense felt that the jury might use the evidence for improper purposes, it could have requested a limiting instruction under Mississippi Rule of Evidence 105.
(12) The defense attempted to elicit from Allison that he was "happy" about RM's suspected pregnancy. The trial court sustained a relevancy objection to that inquiry. Since Allison's theory of the case was that he assaulted RM because of an argument over paternity, it is difficult to see the benefit to the defense of such an inquiry. To the contrary, in order to accept Allison's version of events, the jury would have to become convinced that Allison was not particularly happy with the fact that RM might be pregnant because of doubts on the question of paternity. In all events, we are satisfied that the court's ruling on this point did not undermine the overall integrity of the trial.
(13) Defense counsel was stopped from inquiring into the physical size of RM's friend's husband, who was present when Allison and RM deposited the friend at her home. Defense counsel argues that this was relevant because he was a large man who could have offered RM physical protection from Allison had she chosen that opportunity to escape from Allison rather than returning home with him. It certainly was relevant for the defense to try to show that RM had ample opportunity to get away from Allison during the trip to take RM's friend home, so that her decision to return to Allison's home could be understood to be voluntary rather than one made under duress. However, we do not think that this line of attack on RM's story was critically prejudiced by the defendant's inability to show that RM's friend's husband was of sufficient size and strength to protect her from Allison.
(14) The defense called Ella Williams, the defendant's mother. During her cross-examination, she appeared to contradict herself on several points. Defense counsel, in an attempt to rehabilitate the witness, asked her if she was nervous and then asked. "And when you get nervous do you sometimes make errors?" The State interposed an objection that defense counsel was leading the witness, which the trial court sustained. We agree that this question was leading and thus objectionable. We also are satisfied that it would have added nothing of any significance to the jury's store of knowledge of the case for the jurors to have heard *1022 the witness answer the inquiry in the affirmative. We are satisfied that, in order for an evidentiary ruling to destroy the fundamental integrity of a trial, the excluded evidence must go to matters of substantially greater gravity than this.