753 So.2d 1136 (2000)
James R. RUSHING, Jr. a/k/a "Devil Catcher", Appellant,
v.
STATE of Mississippi, Appellee.
No. 97-KA-01237-COA.
Court of Appeals of Mississippi.
February 8, 2000.
Certiorari Denied April 27, 2000.
*1138 Ross R. Barnett Jr., Jackson, Earl P. Jordan Jr., James A. Williams, Meridian, Attorneys for Appellant.
Office of the Attorney General by Jeffrey A. Klingfuss, Attorneys for Appellee.
EN BANC:

ON MOTION FOR REHEARING
KING, P.J., for the Court:
¶ 1. This Court having granted Rushing's motion for rehearing withdraws its prior opinion and substitutes this opinion in lieu thereof.
¶ 2. James R. Rushing, Jr. a/k/a "Devil Catcher" was convicted of aggravated assault and rape in the Lauderdale County Circuit Court and sentenced to terms of twenty years and ten years, respectively, in the custody of the Mississippi Department of Corrections, said sentences to run consecutively. Rushing assigns seven errors on appeal which we quote verbatim from his brief:
I. WHETHER A JURY INSTRUCTION ON AGGRAVATED ASSAULT WITH A "DEADLY WEAPON" WITHOUT THE ELEMENT OF "SERIOUS BODILY INJURY" IS A VARIANCE FROM AN INDICTMENT THAT DOES NOT HAVE "DEADLY WEAPON" AS AN ELEMENT BUT ONLY HAS "SERIOUS BODILY INJURY" AND THE DEFENDANT IS DENIED PROPER CONSTITUTIONAL NOTICE OF THE CHARGES, A FAIR TRIAL, THE RIGHT TO CONFRONTATION AND DUE PROCESS OF LAW.
*1139 II. WHETHER JURY INSTRUCTIONS ON AGGRAVATED ASSAULT ARE "PLAIN ERROR" AS A JUDICIAL COMMENT ON THE EVIDENCE BY CONTAINING THE PHRASES "WHEN USED AS A WEAPON UNDER THE EXISTING CIRCUMSTANCES" AND THE PHRASE "A DEADLY WEAPON, SPECIFICALLY A BROKEN POOL STICK" AND THUS THE DEFENDANT IS DENIED A FAIR TRIAL, CONFRONTATION OF WITNESSES AND DUE PROCESS OF LAW.
III. WHETHER THE JURY INSTRUCTIONS UNDER FACTS WHICH SHOWED HITTING WITH A BROKEN POOL STICK, POINTING A GUN AND KICKING WITH A FOOT ARE FATALLY CONFUSING AND ABSTRACT WHEN THE ONLY SPECIFIC REFERENCE TO "DEADLY WEAPON" IN THE INSTRUCTIONS POINTS TO THE POOL STICK AND THUS THE DEFENDANT IS DENIED A FAIR TRIAL AND DUE PROCESS OF LAW AND TRIAL BY JURY.
IV. WHETHER THE EVIDENCE OF FORCIBLE RAPE IS SUFFICIENT TO SUPPORT A VERDICT OF GUILTY WHEN THERE WAS NO CONTEMPORANEOUS FORCE AND THE VICTIM HAD MANY OPPORTUNITIES TO SEEK AID, ASSISTANCE AND FLEE FROM THE PRESENCE OF THE DEFENDANT WITH WHOM SHE HAD A LONG TERM BENEFICIAL SEXUAL LIAISON AND SHE TRAVELED WITH HIM BACK TO HER TRAILER AND NEARLY TWELVE HOURS AFTER THE COUPLING FIRST TOLD THE INTERROGATING OFFICER SHE HAD NOT BEEN SEXUALLY ASSAULTED.
V. WHETHER THE DEFENDANT WAS DENIED HIS RIGHT TO CONFRONTATION OF WITNESSES AND A FAIR TRIAL WHEN MOMENTS BEFORE THE VICTIM'S SON WAS TO TESTIFY, THE STATE FIRST DISCLOSED TO THE DEFENDANT THAT THE SON WOULD TESTIFY TO DEFENDANT'S ADMISSION OF ASSAULTING THE MOTHER AND TESTIFY THAT THE DEFENDANT HAD MADE THREE VALUABLE OFFERS TO THE MOTHER IF SHE WOULD DROP CHARGES.
VI. WHETHER THE DEFENDANT WAS DENIED HIS RIGHT TO CONFRONTATION AND A FAIR REFUSED ADMISSIBILITY OF THE VICTIM'S CONTRADICTORY STATEMENT TO THE INTERROGATING OFFICER THAT SHE HAD NOT BEEN SEXUALLY ASSAULTED.
VII. WHETHER THE EVIDENCE WAS SUFFICIENT TO SUPPORT A VERDICT OF AGGRAVATED ASSAULT, WHEN THE VICTIM ONLY HAD BRUISES, REDNESS ON THE THROAT FROM ALLEGED CHOKING AND A BROKEN FINGER AND GAVE A CONTRADICTORY AND EXAGGERATED ACCOUNT OF THE INCIDENT WITH THE DEFENDANT AT THE BAR AND MUCH LATER ENGAGED IN VOLUNTARY SEX WITH HIM AFTER REJECTING AN OPPORTUNITY TO RETURN TO HER TRAILER ALONE WITHOUT DEFENDANT.
¶ 3. Finding merit in Appellant's argument on the jury instructions, this Court reverses and remands on the charge of aggravated assault and affirms on the charge of rape.

FACTS
¶ 4. Shortly after 12:00 a.m. on February 3, 1997, James Rushing used his car telephone to inform M.L., his mistress of five years with whom he had a child, to get dressed that he was on his way to pick her up. Since Rushing was married, it was not unusual for the couple to go out late at night. Fifty-one year old Rushing is retired from the United States Marine Corp. with a medical disability. Rushing wears a prosthesis because one of his legs was amputated below the knee after Rushing was injured while serving in Vietnam. *1140 Rushing had a house trailer in which M.L. lived.
¶ 5. When Rushing called, M.L. told him she was talking on the other line to her aunt, Terry Collier, and her sister who had called to wish her happy birthday. Rushing accused M.L. of lying because he had M.L.'s sister on his other line.
¶ 6. According to Rushing, upon his arrival at M.L.'s trailer, he noticed the washer, dryer and microwave oven were missing. Rushing had given money to M.L. to pay the rental company and therefore asked where the appliances were. M.L. insisted that she had paid the rental company, and did not know why it had repossessed the appliances.
¶ 7. As the couple was leaving, M.L. informed her son that she was leaving with "Devil Catcher," Rushing's street name.
¶ 8. M.L. testified that Rushing began driving to a nightclub which he owned. While en route, Rushing telephoned a friend who M.L. assumed was Fred Cole. Rushing told Cole that he had "this bitch in the car and was trying to find somewhere to kill her." Rushing and M.L. arrived at the club about 1:00 a.m. Rushing unlocked the door saying, "After tonight I am not going to worry about you lying to me; you will be out of my life." Once inside the club, Rushing cursed M.L. and told her to take off her clothes. M.L. saw he was serious and undressed. Rushing picked up a broken pool stick, which M.L. described as about three feet long, from under a counter. M.L. was positioned between two coolers. Rushing was standing between M.L. and the door.
¶ 9. Rushing began striking M.L. with the pool stick across her buttocks. When M.L. put her hand back, Rushing told her not to or he would hit her across the head. He then pulled a gun out from under the counter and pointed it at her while cursing. M.L. testified she was scared.
¶ 10. Rushing eventually put the gun down and picked up the pool stick. He again beat M.L. across her buttocks, back, arm and legs. Angry because M.L. put her hand back to protect her buttocks, Rushing repeatedly hit her head with the pool stick until she fell to the floor. Rushing used his foot to stomp M.L. Kneeling over M.L., Rushing choked her while saying that she needed to die.
¶ 11. When Rushing stopped choking M.L., he asked her for Terry's telephone number. M.L. put her clothes back on while Rushing called Terry about talking on the telephone with M.L.. M.L. heard Rushing tell Terry that the time was twenty minutes until 2:00 a.m.
¶ 12. Rushing was still angry when his conversation with Terry ended. Rushing told M.L. to undress again and struck her several more times with the pool stick. M.L. passed out. When she regained consciousness, Rushing had her by the arm pulling her off the floor. M.L. passed in and out of consciousness. Rushing drove M.L. to the trailer. M.L. testified that as she was getting out of his car, Rushing said, "Well, I suppose you don't want to f___ now, huh?" She replied that she did not, since he had kicked her, beat her and pulled a gun on her.
¶ 13. M.L. laid across the hood of Rushing's car to compose herself. She managed to make it through the door of the trailer then passed out again. When she came to, Rushing was pulling her off the floor. She took off her jeans and laid across the bed on her stomach because her buttocks were hurting. Rushing began making sexual advances, but M.L. pushed his hand back and told him no. M.L. continued to drift in and out of consciousness.
¶ 14. After daybreak, Terry called M.L. and sensed something was wrong with her. M.L. did not confide in Terry because Rushing was lying beside her. Rushing again made sexual advances toward M.L. This time, M.L. submitted to sexual intercourse with Rushing as a means of getting *1141 him to leave her alone and to leave. Rushing left about noon on February 3. As soon as Rushing left, M.L. soaked in a tub of hot water to alleviate her pain. About 4:00 P.M., Terry came to check on M.L. and immediately took her to the hospital.
¶ 15. On February 3, 1997 at about 5:30 p.m., Jason McElhenney, a detective assigned to the criminal investigation division of the Meridian Police Department, was dispatched to the emergency room of Riley Hospital to investigate an assault. Upon arrival at the hospital, McElhenney saw bruises on M.L.'s arms and legs. Pursuant to McElhenney's instructions, Debbie Williamson, a nurse photographed the victim. After talking with the victim, McElhenney told her to come to the police station to file charges against Rushing. The victim arrived at the police station at about 10:00 p.m. with Terry. McElhenney testified the victim left the police station at about 11:45 p.m. and returned to the hospital.
¶ 16. Paula Strickland, a registered nurse, was on duty when the victim returned to Riley Hospital after pressing charges against Rushing at the police station on February 3, 1997. Strickland testified that the victim arrived at the hospital with a police officer to have a sexual assault kit completed. During the physical examination, Strickland noted the victim had a red mark on the right side of her neck and bruises to her buttocks area, left thigh and upper arm. The victim was given medication to alleviate pain. According to Strickland, the victim "was crying, but she was relatively calm, very nervous."
¶ 17. In addition to the bruises found on the victim's head, buttocks, legs and arms, an x-ray of the victim's hand revealed a broken finger was sustained in the beating. A CAT scan was also performed on the victim at Riley Hospital.
¶ 18. Rushing's version of the events of February 3 differs. Rushing testified that he picked M.L. up after midnight on February 3, 1997. He inquired about the missing appliances. On the way to the club, Rushing accused M.L. of lying. When they arrived at the club, Rushing got M.L. a drink. He sat on a stool. M.L. began yelling at him for calling her a liar. As he was standing up, Rushing brushed against M.L. causing her to trip over a rubber mat. She fell, landing on her back. M.L. grabbed a cue stick and came up swinging at him. He took the stick from M.L. and hit her with it across the back side no more than four times. Rushing denied having choked M.L. or hit her on the head with the pool stick. He stated his prosthesis, made it impossible for him to choke M.L. by kneeling over her as described. Rushing stated that he was seated as he hit M.L. and that she was fully clothed. Any wounds inflicted upon M.L. were done through her clothes. Rushing acknowledged having struck M.L. with the pool stick. He struck her because she spent the money which was to pay the rent on the appliances. "I hit her out of anger because she had messed up the bill money."
¶ 19. Rushing testified that he offered to provide M.L. a cab to go home, however she declined. He then drove M.L. home and remained in the car. Having gotten out of the car, M.L. turned around and asked Rushing if he was getting out. Rushing followed M.L. into the trailer but never really looked at her because he was still upset about the bills. He went to sleep with M.L.
¶ 20. The next morning, they were awaken by the telephone. After answering the telephone, M.L. got back in bed nude and initiated sexual intercourse. M.L. expressed remorse about lying to Rushing. As they had sexual intercourse Rushing noticed no bruises on M.L.
¶ 21. Fred Cole was called as a witness for the defense. Cole testified he was in the hospital on February 2 and 3. Rushing *1142 called him around midnight the night of the incident and talked for about three or four minutes. Cole did not hear Rushing cursing M.L. during the telephone conversation.
¶ 22. Rushing was arrested on February 4, 1997. An indictment was returned on March 20, 1997, which charged Rushing with aggravated assault in violation of Miss.Code Ann. § 97-3-7(2) (Rev.1994)[1] and rape in violation of Miss.Code Ann. § 97-3-65(2) (Rev.1994).[2] Rushing entered pleas of not guilty on April 4, 1997. After a two-day trial, the jury returned a verdict of guilty on both counts. The court sentenced Rushing to twenty years on the aggravated assault verdict and ten years on the rape verdict to run consecutively. Rushing's motion for a new trial and/or judgment notwithstanding the verdict was denied. This appeal followed.

ARGUMENT AND DISCUSSION OF LAW
¶ 23. Given this Court's disposition of this case, it is appropriate to first address Rushing's issues IV, V and VI, and collectively address issues I, II and III. Because this Court has found merit in Rushing's issues regarding jury instructions, it is not necessary to address issue VII.
ISSUE IV. WHETHER THE EVIDENCE OF FORCIBLE RAPE IS SUFFICIENT TO SUPPORT A VERDICT OF GUILT WHEN THERE WAS NO CONTEMPORANEOUS FORCE AND THE VICTIM HAD MANY OPPORTUNITIES TO SEEK AID, ASSISTANCE AND FLEE FROM THE PRESENCE OF THE DEFENDANT WITH WHOM SHE HAD A LONG TERM BENEFICIAL SEXUAL LIAISON AND SHE TRAVELED WITH HIM BACK TO HER TRAILER AND NEARLY TWELVE HOURS AFTER THE COUPLING FIRST TOLD THE INTERROGATING OFFICER SHE HAD NOT BEEN SEXUALLY ASSAULTED.
¶ 24. Rushing's fourth issue addresses the sufficiency of the evidence to support his conviction of rape. When the legal sufficiency of the evidence is challenged we will not retry the facts. Rather, we must assume that the fact-finder believed the State's witnesses and disbelieved any contradictory evidence. McClain v. State, 625 So.2d 774, 778 (Miss. 1993); Griffin v. State, 607 So.2d 1197, 1201 (Miss.1992). To determine whether there is an insufficiency as to any element of the offense, we consider all the evidence as to that element in the light most favorable to the State. McClain, 625 So.2d at 778. All credible evidence which is consistent with Rushing's guilt "must be accepted as true," and the State is "given the benefit of all favorable inferences that may be reasonably drawn from the evidence." Id. This Court will reverse only where, "with respect to one or more of the elements of the offense charged, the evidence so considered is such that reasonable and fair-minded jurors could only find the accused not guilty." Id.
¶ 25. Rushing argues that the evidence was insufficient to support the jury verdict finding him guilty of forcibly raping the victim because no contemporaneous force was used, the victim had many opportunities to seek aid, assistance, and flee from Rushing, the victim had had a long-term sexual relationship with Rushing, the victim had waited nearly twelve hours after the attack to report the rape, and the victim had denied she had been raped when first questioned by an officer.
¶ 26. Rushing was convicted under Miss. Code Ann. § 97-3-65(2) (Rev.1994) which provides:

*1143 Every person who shall forcibly ravish any person of the age of fourteen (14) years or upward, or who shall have been convicted of having carnal knowledge of any person above the age of fourteen (14) years without such person's consent....
¶ 27. Reviewing the evidence in the light most favorable to the State, we find the evidence was sufficient to establish and to support the three elements necessary to prove rape, i.e., (a) carnal knowledge, (b) without consent and by force, and (c) of a female age fourteen or upward. Hailey v. State, 537 So.2d 411, 414 (Miss.1988).
¶ 28. As the Mississippi Supreme Court noted in Hull v. State, 687 So.2d 708, 723 (Miss.1996):
[O]ne of the elements of rape is that it is done "without consent and by force,".... While this is true, this Court stated in Stewart v. State, 466 So.2d 906 (Miss.1985):
The well-settled rule is that in a prosecution for rape, physical force on the part of the assailant or physical resistance on the part of the victim is not necessary if the proof shows beyond a reasonable doubt that the victim surrendered because of fear arising out of a reasonable apprehension of great bodily harm.
¶ 29. Thus, proof that Rushing used additional, contemporaneous force to have sexual intercourse with M.L. is unnecessary if the evidence establishes that she surrendered because of fear arising out of a reasonable apprehension of great bodily harm. The evidence established that the victim was cursed, severely beaten while nude, and threatened with a gun before she was returned to her trailer. The victim drifted in and out of consciousness throughout the remainder of the night and early morning. Although no contemporaneous force was inflicted upon the victim, the jury could reasonably find that the victim submitted to sexual intercourse with Rushing out of fear that to resist would cause Rushing to further inflict bodily injury upon her. Indeed, the victim stated her belief that Rushing would not leave her alone, or leave, until he had sexual intercourse.
¶ 30. Rushing contends that M.L. consented to sexual intercourse. Rushing suggests that the fact M.L. had the opportunity to seek, aid, assistance or to flee from him and did not do so, is consistent with acts of consensual intercourse. While the jury might appropriately consider these matters on the issue of consent, they were not dispositive. These matters must be weighed against the evidence offered in opposition to Rushing's suggestion of consensual intercourse.
¶ 31. The most important part of that evidence was the testimony of M.L. wherein she (1) denied having engaged in consensual intercourse, (2) stated that Rushing had, "beat me half senseless", and (3) stated her belief that Rushing would not leave her alone or leave her, until he had intercourse with her.
¶ 32. The conflict in testimony merely raised a question of credibility. Questions of credibility are to be resolved by the finders of fact, the jury. Eakes v. State, 665 So.2d 852, 872 (Miss.1995). When the record contains credible evidence consistent with the jury verdict, this Court is obligated to affirm that verdict, Holmes v. State, 660 So.2d 1225, 1227 (Miss.1995), unless to do so would work an unconscionable injustice. White v. State, 732 So.2d 961 (1120) (Miss.1999).
¶ 33. Based upon the record before it, this Court finds that substantial credible evidence existed upon which the verdict could have found Rushing guilty of rape. Holmes v. State, 660 So.2d 1225, 1227 (Miss.1995). This assignment of error is without merit.
*1144 ISSUE V. WHETHER THE DEFENDANT WAS DENIED HIS RIGHT TO CONFRONTATION OF WITNESSES AND A FAIR TRIAL WHEN MOMENTS BEFORE THE VICTIM'S SON WAS TO TESTIFY, THE STATE FIRST DISCLOSED TO THE DEFENDANT THAT THE SON WOULD TESTIFY TO DEFENDANT'S ADMISSION OF ASSAULTING THE MOTHER AND TESTIFY THAT THE DEFENDANT HAD MADE THREE VALUABLE OFFERS TO THE MOTHER IF SHE WOULD DROP CHARGES.
¶ 34. Rushing argues the trial court erred by denying his motion to exclude R.L.'s (the victim's son) testimony that (1) Rushing offered the victim money, a house and car repairs to drop the charges against Rushing, (2) that Rushing admitted to R.L. that he hit M.L., and (3) that Rushing denied raping M.L. This argument is predicated upon the State's failure to provide Rushing a complete written summary of R.L.'s statement in a timely fashion in violation of URCCC 9.04.
¶ 35. The record reveals the following colloquy outside the presence of the jury:
BY THE COURT: ... The State has furnished to the defendant a summary of a statement made by R.L. today. That substance of that summary in writing has been furnished to the defendant. Mr. Jordan, you had a motion that you would like to make?
BY MR. JORDAN: Your Honor, we make a motion that this witness, because of this particular statement, be excluded from testifying. Mr. Merchant had talked with him earlier concerning this matter, and that none of these matters were mentioned to Mr. Merchant, who is Mr. Rushing's investigator. We claim surprise, Your Honor.
BY THE COURT: Well, he will be subject to cross-examination on that. Is that your only objection? You have listed him as a defense witness.
BY MR. JORDAN: That's true, I did.
BY THE COURT: The State listed him as a State's witness. Both of y'all have had an opportunity to talk with him, so there is nothing for me to rule on.
¶ 36. There is no question that the defense knew for some time prior to trial that R.L. would be called as a witness for the State. R.L. was listed as a witness by the State in the discovery packet furnished pursuant to defense counsel's oral request on April 11, 1997. Prior to trial, Rushing's investigator interviewed R.L., who did not inform him that Rushing had offered certain items to M.L. if she would drop the charges against him. Nor was this information contained in the summary provided to Rushing. Rushing asserts the State had a continuing duty to supplement the information disclosed by furnishing defense counsel a copy of R.L.'s complete statement. The duty to seasonally supplement discovery exists even where the defendant and the State have listed the same person as a witness. Houston v. State, 531 So.2d 598, 610-11 (Miss.1988); URCCC 9.04(E).
¶ 37. While Rushing knew before trial that he had asked R.L. to relay the offers to M.L., he was not aware that R.L. had stated the offers were contingent upon M.L.'s dropping the charges.
¶ 38. We find the failure to inform Rushing of this to have been error. However, under the facts of this case we hold it to be harmless error. We would caution the trial courts, that the duty to fully comply with URCCC 9.04, exists even where both parties have identified the same witnesses.
¶ 39. Rushing's argument that the trial court erred by not granting a continuance is without merit. In the case sub judice, defense counsel did not request a continuance after the trial court denied his motion to exclude R.L.'s testimony. "If, after this opportunity for familiarization, the defendant believes he may be prejudiced by lack of opportunity to prepare to *1145 meet the evidence, he must request a continuance. Failure to do so constitutes a waiver of the issue." Traylor v. State, 582 So.2d 1003, 1006 (Miss.1991) (citing Kelly v. State, 553 So.2d 517, 520 (Miss.1989)).
ISSUE VI. RULING THAT THE VICTIM'S STATEMENT TO THE INTERROGATING OFFICER WAS INADMISSIBLE WAS MANIFEST ERROR
¶ 40. Rushing asserts the interests of justice require the reversal of his conviction and remand of the case due to the trial court's ruling that M.L.'s statement to the interrogating officer was inadmissible. The trial court is vested with broad discretion in the matter of judging the admissibility of evidence based on its relevance to the issue being tried. Johnson v. State, 655 So.2d 37, 42 (Miss.1995). The trial court's determination that the written statement of the victim to the investigating officer was inadmissible did nothing to deprive Rushing of the opportunity to cross-examine the victim and the interrogating officer about M.L.'s initial denial that she had been sexually assaulted on February 3, 1997 by Rushing. Indeed, in response to the specific question from Rushing's attorney, M.L. acknowledged having first told the investigating officer that no rape occurred.
ISSUE I. WHETHER A JURY INSTRUCTION ON AGGRAVATED ASSAULT WITH A "DEADLY WEAPON" WITHOUT THE ELEMENT OF "SERIOUS BODILY INJURY" IS A VARIANCE FROM AN INDICTMENT THAT DOES NOT HAVE "DEADLY WEAPON" AS AN ELEMENT BUT ONLY HAS "SERIOUS BODILY INJURY" AND THE DEFENDANT IS DENIED PROPER CONSTITUTIONAL NOTICE OF THE CHARGES, A FAIR TRIAL, THE RIGHT TO CONFRONTATION AND DUE PROCESS OF LAW.
ISSUE II. WHETHER JURY INSTRUCTIONS ON AGGRAVATED ASSAULT ARE "PLAIN ERROR" AS JUDICIAL COMMENT ON THE EVIDENCE BY CONTAINING THE PHRASES "WHEN USED AS A WEAPON UNDER THE EXISTING CIRCUMSTANCES" AND THE PHRASE "A DEADLY WEAPON, SPECIFICALLY A BROKEN POOL STICK" AND THUS THE DEFENDANT IS DENIED A FAIR TRIAL, CONFRONTATION OF WITNESSES AND DUE PROCESS OF LAW.
ISSUE III. WHETHER THE JURY INSTRUCTION UNDER FACTS WHICH SHOWED HITTING WITH A BROKEN POOL STICK, POINTING A GUN AND KICKING WITH A FOOT ARE FATALLY CONFUSED AND ABSTRACT WHEN THE ONLY SPECIFIC REFERENCE TO "DEADLY WEAPON" IN THE INSTRUCTIONS POINTS TO THE POOL STICK AND THUS THE DEFENDANT IS DENIED A FAIR AND DUE PROCESS OF LAW AND TRIAL BY JURY.
¶ 41. The first three issues presented by Rushing on appeal involve the aggravated assault jury instructions. Rushing argues the State's aggravated assault jury instructions were at variance with the indictment, were a judicial comment on the evidence presented, and were fatally confusing to the jury. Viewing the instructions as a whole, we find the jury was not properly instructed.
¶ 42. Rushing contends he was charged with the crime of aggravated assault under Miss.Code Ann. § 97-3-7(2)(a) because the words "with a deadly weapon" were not included in the indictment. Rushing argues that Jury Instruction C-7 effectively amended the indictment to charge him with aggravated assault under § 97-3-7(2)(b). In Quick v. State, 569 So.2d 1197 (Miss.1990), the supreme court held that "the state can prosecute only on the indictment returned by the grand jury and ... the court has no authority to modify or amend the indictment in any material respect." Id. at 1199. Quick was indicted specifically under § 97-3-7(2)(b) of the aggravated assault statute, which requires purposeful, wilful, and knowing actions on the part of the accused. However, he was convicted under § 97-3-7(2)(a) of the aggravated assault statute, which requires *1146 recklessness and extreme indifference to the value of human life. The supreme court reversed and remanded the case finding that the jury instructions clearly contained a "new element which was not contained in the original indictment and... it was evidently this part of the instruction upon which the jury returned its verdict. Under these circumstances we have no alternative but to reverse and remand...." Id. at 1200.
¶ 43. The record shows Rushing was indicted for aggravated assault under § 97-3-7(2). Neither subsection (a) nor (b) was specified. The relevant portion of that indictment reads, "did then and there wilfully, unlawfully, knowingly, and feloniously and purposely cause or attempt to cause serious bodily injury to another, M.L., by hitting her with a broken pool stick and kicking her, in violation of Mississippi Code Annotated Section 97-3-7(2)(1972)."
¶ 44. Section 97-3-7(2) of the Mississippi Codes provides:
A person is guilty of aggravated assault if he (a) attempts to cause serious bodily injury to another, or causes such injury purposely, knowingly or recklessly under circumstances manifesting extreme indifference to the value of human life; or (b) attempts to cause or purposely or knowingly causes bodily injury to another with a deadly weapon or other means likely to produce death or serious bodily harm;
¶ 45. A criminal defendant is entitled to a clear statement of the crime with which he is charged, and the conduct which allegedly constitutes criminal behavior. Peterson v. State, 671 So.2d 647, 653 (Miss.1996). The prosecution is held strictly to prove the allegations of the indictment and may not vary from the proof of those allegations unless the variance is a lesser-included-offense. Clark v. State, 181 Miss. 455, 461, 180 So. 602 (1938). See also Sloan v. State, 368 So.2d 228, 229 (Miss.1979).
¶ 46. By reading the indictment along side § 97-3-7(2), it becomes readily apparent that the State had indicted Rushing pursuant to § 97-3-7(2)(a). Therefore, any jury instruction given should be consistent with § 97-3-7(2)(a) and any resulting verdict of guilty must be based solely on the substantive allegations of the indictment. That is, it must be clear that the jury verdict was based upon the elements of § 97-3-7(2)(a).
¶ 47. Under the holding of Quick v. State, 569 So.2d 1197, 1199 (Miss.1990), the trial court may not directly, or indirectly amend the indictment to alter the substance of the charges against the defendant. By giving jury instruction C-7, the trial court indirectly amended the indictment, by dropping the serious bodily injury element of § 97-3-7(2)(a), and substituting the deadly weapon element of § 97-3-7(2)(b).
¶ 48. Having committed error by the indirect amendment of the indictment, the trial court compounded that error in jury instruction C-7 by declaring as a matter of law that "a broken pool stick" is a deadly weapon. Unless an item is inherently dangerous and deadly, it may not, as a matter of law, be declared a deadly weapon. State v. Sims, 80 Miss. 381, 386, 31 So. 907, 907 (1902). Whether an item which is not inherently dangerous may become a deadly weapon based upon its use is a question of fact to be determined by the jury. Id. at 386, 31 So. 907. See also State v. Ware, 102 Miss. 634, 59 So. 854 (1912)(pocketknife); Porter v. State, 616 So.2d 899 (Miss.1993)(garbage bag). Whether a broken pool stick is a deadly weapon, is a question of fact to be determined by the finders of fact, the jury.
*1147 ¶ 49. Because this Court finds error in the granting of instruction C-7, we are constrained to reverse and remand Appellant's conviction of aggravated assault.
¶ 50. THE JUDGMENT OF THE CIRCUIT COURT OF LAUDERDALE COUNTY OF CONVICTION OF RAPE AND SENTENCE OF TEN YEARS AND $2,000 FINE, IN THE CUSTODY THE MISSISSIPPI DEPARTMENT OF CORRECTIONS IS AFFIRMED. THE JUDGMENT OF AGGRAVATED ASSAULT IS REVERSED AND REMANDED FOR PROCEEDINGS NOT INCONSISTENT WITH THIS OPINION. COSTS ARE ASSESSED AGAINST LAUDERDALE COUNTY.
McMILLIN, C.J., SOUTHWICK, P.J., DIAZ, J. CONCUR. PAYNE, J., CONCURRING IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION JOINED BY BRIDGES, AND LEE, JJ. IRVING, J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION JOINED BY THOMAS, J. MOORE, J., NOT PARTICIPATING.
PAYNE, J., concurring in part, dissenting in part.
¶ 51. I concur with the majority that Rushing's conviction for rape must be sustained. However, I respectfully disagree with regard to the majority's reversal of the aggravated assault conviction. By his own admission, Rushing repeatedly hit M.L. with a pool stick because he was angry over her having misspent money he had given her. The only conflict in the testimony was the position from which Rushing beat M.L.Rushing never denied striking M.L. with the pool stick. Viewing the instructions as a whole, I find the jury was properly instructed and that Instruction C-7 did not amount to a judicial comment on the evidence and was not prejudicial to Rushing. Accordingly, I find the aggravated assault conviction should be affirmed.
¶ 52. Rushing contends he was charged with the crime of aggravated assault under Miss.Code Ann. § 97-3-7(2)(a) because the words "with a deadly weapon" were not included in the indictment. Rushing argues that Jury Instruction C-7 effectively amended the indictment to charge him with aggravated assault under § 97-3-7(2)(b). In Quick v. State, 569 So.2d 1197 (Miss.1990), the supreme court held that "the state can prosecute only on the indictment returned by the grand jury and ... the court has no authority to modify or amend the indictment in any material respect." Id. at 1199. Quick was indicted specifically under § 97-3-7(2)(b) of the aggravated assault statute, which requires recklessness and extreme indifference to the value of human life. The supreme court reversed and remanded the case finding that the jury instructions clearly contained a "new element which was not contained in the original indictment and... it was evidently this part of the instruction upon which the jury returned its verdict. Under these circumstances we have no alternative but to reverse and remand...." Id. at 1200.
¶ 53. Rushing was indicted for aggravated assault under § 97-3-7(2) which alleged that Rushing did "wilfully, unlawfully, knowingly, and feloniously and purposely cause or attempt to cause serious bodily injury to another ... by hitting her with a broken pool stick and kicking her, in violation of Mississippi Code Annotated Section 97-3-7(2) (1972)...." While neither subsection (a) nor (b) was specified, a fair and reasonable reading of the indictment, in my view, evidences that subsection (b) is applicable which provides: "[a] person is guilty of aggravated assault if he ... attempts to cause or purposely or knowingly causes bodily injury to another with a deadly weapon or other means likely to produce death or serious bodily harm...." The broken pool stick could be a deadly weapon, and Rushing's savagely kicking the victim equates to a means likely to produce death or serious bodily harm. *1148 Thus, I find the indictment was not so narrowly drawn to preclude the State from arguing the pool stick was used as a deadly weapon.
¶ 54. Accordingly, I find no new element was contained in Instruction C-7 which was not contained in the original indictment:
The Court instructs the Jury that should you find from the evidence in this case beyond a reasonable doubt that
1. On or about February 3, 1997, in Lauderdale County, Mississippi,
2. The Defendant James R. Rushing did purposefully or knowingly cause or attempt to cause bodily injury to [the victim] with a deadly weapon, specifically a broken pool stick, by beating her or other means likely to produce death or serious bodily harm.
then it is your sworn duty to find the Defendant James R. Rushing guilty of Aggravated Assault under Count I of the indictment in this cause.
Should the State fail to prove any one or more of these essential elements beyond a reasonable doubt then you shall find the Defendant James R. Rushing not guilty under Count I of the indictment in this cause.
¶ 55. It is well established that instructions to the jury should not single out or contain comments on specific evidence. Voyles v. State, 362 So.2d 1236 (Miss.1978); Williams v. State, 354 So.2d 266 (Miss. 1978); Scott County Co-op v. Brown, 187 So.2d 321 (Miss.1966); White v. Miss. Power Co., 252 Miss. 97, 171 So.2d 312 (1965). Rushing's argument that the jury instruction describing the broken pool stick as a deadly weapon amounted to judicial comment is without merit. Rushing admitted to striking the victim intentionally with a broken pool stick repeatedly about the buttocks, arms and legs. Whether, under the existing circumstances described during the trial, the pool stick was a deadly weapon or a means likely to produce death or serious bodily harm to the victim was a question of fact for the jury to determine. It is clear to me that in deciding whether the State had proven beyond a reasonable doubt the elements of aggravated assault set forth in Instruction C-7, if the jurors had found one or more elements were not sufficiently proven, they would have instinctively turned to Instruction C-9 and C-13.
¶ 56. Instruction C-9 provided that "a deadly weapon may be defined as any object, article, or means which, when used as a weapon under the existing circumstances, is reasonably capable of producing or is likely to produce death or serious bodily harm to a human being upon whom the object, article, or means is used." Instruction C-13, to which Rushing objected but was overruled by the trial judge, instructed the jury that serious bodily injury is "bodily injury which creates a substantial risk of death or which causes serious, permanent disfigurement, or protractive loss or impairment of the function of any bodily member or organ." The trial court found the definition given to be the same as that found in the Model Penal Code § 210 (1980) which was cited favorably by the supreme court in Yates v. State, 685 So.2d 715, 720 (Miss.1996), and Fleming v. State, 604 So.2d 280, 292 (Miss.1992).
¶ 57. Moreover, if the jury determined that the State failed to prove all of the essential elements of the crime of aggravated assault, a simple assault instruction was given in Instruction C-8. Further, Instruction C-3 directed jurors "not to single out any ... individual point or instruction and ignore the others." The jury was thoroughly instructed as to the essential elements of the crime of assault, either simple or aggravated. Given the well settled presumption that jurors follow the instructions given them and given the verdict of guilty of the crime of aggravated assault, the jury found beyond a reasonable doubt that Rushing knowingly and purposefully hit the victim with the pool stick, a deadly weapon, causing the victim serious bodily injury.
*1149 ¶ 58. I find that Instruction C-7, when considered along with all the other instructions given by the trial court, did not create confusion for the jury or prejudice to Rushing. As such, the aggravated assault conviction ought to be affirmed.
¶ 59. Finally, I pause to urge the supreme court to construe § 97-3-7(2)(a) and § 97-3-7(2)(b) similarly to the way that the court has construed § 97-3-19(1)(a) and § 97-3-19(1)(b), our murder statute. As the supreme court has noted in this regard:
[t]here is no question that the structure of the statute suggests two different kinds of murder: deliberate design/premeditated murder and depraved heart murder. The structure of the statute suggests these are mutually exclusive categories of murder. Experience belies the point. As a matter of common sense, every murder done with deliberate design to effect the death of another human being is by definition done in the commission of an act imminently dangerous to others and evincing a depraved heart, regardless of human life. Our cases have for all practical purposes coalesced the two so that Section 97-3-19(1)(b) subsumes (1)(a).
Catchings v. State, 684 So.2d 591, 599 (Miss.1996) (citing Mallett v. State, 606 So.2d 1092, 1095 (Miss.1992)).
¶ 60. Similarly, common sense dictates to me that if an offender employs a "deadly weapon" in the course of an assault (see § 97-3-7(2)(b)), this is necessarily a circumstance "manifesting an extreme indifference to the value of human life." (See § 97-3-7(2)(a)). The effect of such a rule with regard to the aggravated assault statute would overrule the troublesome decision in Quick v. State, which created a huge loophole, in my opinion, for offenders who commit the crime of aggravated assault.
¶ 61. I would affirm the aggravated assault conviction.
BRIDGES AND LEE, JJ., JOIN THIS SEPARATE WRITTEN OPINION.
IRVING, J., CONCURRING IN PART AND DISSENTING IN PART:
¶ 62. I concur with the majority's conclusion that Rushing's conviction of aggravated assault must be reversed, but because I arrive at this conclusion via a slightly different route than does the majority, I write separately to express my view of the reasons necessitating the reversal. Additionally, I dissent from the majority's holding that the evidence is sufficient to sustain the jury's verdict as to rape. For the reasons which follow, I would reverse and render on the issue of rape.

Aggravated Assault as Charged in the Indictment
¶ 63. Rushing was indicted under Miss. Code Ann. § 97-3-7(2) (Rev.1994)[3] which reads in pertinent part as follows:

*1150 A person is guilty of aggravated assault if he (a) attempts to cause serious bodily injury to another, or causes such injury purposely, knowingly or recklessly under circumstances manifesting extreme indifference to the value of human life; or (b) attempts to cause or purposely or knowingly causes bodily injury to another with a deadly weapon or other means likely to produce death or serious bodily harm; and, upon conviction, he shall be punished by imprisonment in the county jail for not more than one (1) year or in the penitentiary for not more than twenty (20) years.
¶ 64. I disagree with the majority that the giving of instruction C-7 operated to amend the indictment, and I believe the majority's reliance on Quick v. State, 569 So.2d 1197 (Miss.1990) to support its conclusion in this regard is misplaced. Quick is distinguishable from our case. In Quick, the defendant was charged by indictment with aggravated assault under Miss.Code Ann. § 97-3-7(2)(b) (1972). On the morning of the trial, the State moved to amend the indictment to charge the defendant under Miss.Code Ann. § 97-3-7(2)(a) and (b). No order was contained in the record allowing the amendment, but the jury was instructed as to the elements of aggravated assault under Miss.Code Ann. § 97-3-7(2)(a), the section not charged by the indictment as returned by the grand jury. Id. at 1198.
¶ 65. In the case sub judice, the indictment simply charged Rushing with aggravated assault under Miss.Code Ann. § 97-3-7(2) (1972). No subsection was designated. This is the exact opposite of the charging scheme in Quick. Since Rushing was charged not under a specific single subsection of Miss.Code Ann. § 97-3-7(2), but under the section generally, it necessarily follows that he was charged under both subsections comprising that section. Rushing was therefore put on notice that he was being charged with aggravated assault under both subsections, i.e., by causing injury under circumstances manifesting extreme indifference to the value of human life and by causing bodily injury with a deadly weapon or other means likely to produce death or serious bodily harm. In other words, it seems to me that an indictment which charges the section but does not delineate as to the subsection, charges each of the subsections, limited only by the extent of the language detailing the offense. If the language detailing the offense describes an offense under both subsections, then the charge is laid under both subsections. On the other hand, if the language, detailing the offense, describes a crime proscribed by only one of the subsections, then the charge is laid under that subsection. Of course on a proper motion, a defendant would be entitled to have the State make an election as to the subsection under which the State plans to proceed. The record does not indicate such a motion was made in this case.
¶ 66. In the case at bar, I will concede that reasonable persons could differ as to whether the charging language of the indictment described an offense which may be laid under both § 97-3-7(2)(a) and § 97-3-7(2)(b). What I cannot concede is that the charging language described an offense under § 97-3-7(2)(a) exclusively.
¶ 67. It appears to me that Rushing was placed on notice that he was being charged under both sections. The indictment charged, in pertinent, part that Rushing "did then and there wilfully, unlawfully, knowingly, and feloniously and purposely cause or attempt to cause serious bodily injury to another, M.L., by hitting her with a broken pool stick and kicking her, in violation of Mississippi Code Annotated Section 97-3-7(2) (1972)." I differ with the majority's conclusion that it is readily apparent from a reading of the indictment that the State indicted Rushing pursuant to § 97-3-7(2)(a). Quite the contrary is true. Apparently, the majority reaches this conclusion because the indictment and § 97-3-7(2)(a) both include the modifier "serious" before the phrase "bodily injury" *1151 and no such modifier precedes the phrase "bodily injury" in § 97-3-7(2)(b). However, the majority apparently overlooks the rest of both the indictment and § 97-3-7(2)(b). The rest of the indictment says that the serious bodily injury was done "to another, M.L., by hitting her with a broken pool stick and kicking her" while the rest of § 97-3-7(2)(b) says "to another with a deadly weapon or other means likely to produce death or serious bodily harm." It thus seems clear to me that kicking and hitting one with a pool stick can certainly be construed as "other means likely to produce death or serious bodily harm." Moreover, a charge under § 97-3-7(2)(b) of attempting to cause or causing serious bodily injury is not transformed into a charge under § 97-3-7(2)(a) because of the inclusion of the modifier "serious" before the phrase "bodily injury" as long as the indictment also charges the other relevant language of § 97-3-7(2)(b), to wit: "with a deadly weapon or other means likely to produce death or serious bodily harm."
¶ 68. I also can see how one might interpret the charging languagethat Rushing did "wilfully, unlawfully, knowingly and feloniously and purposely cause or attempt to cause serious bodily injury to another, M.L., by hitting her with a broken pool stick and kicking her"to mean that Rushing was being charged with causing or attempting to cause serious bodily injury purposely, knowingly or recklessly under circumstances manifesting extreme indifference to the value of human life, which of course would be a charge laid under § 97-3-7(2)(a).
¶ 69. Based on the foregoing analysis, I would conclude that instruction C-7 did not operate to amend the indictment to add a charge not returned by the grand jury since it seems very plausible to me that at least Rushing was placed on notice that he was being charged under both subsections of 97-3-7(2). I arrive at this conclusion because causing injury to someone by kicking and hitting him/her with a broken pool stick may be viewed both as (1) causing or attempting to cause serious bodily injury under circumstances manifesting extreme indifference to the value of human life, and (2) causing or attempting to cause bodily injury to another with a deadly weapon or other means likely to produce death or serious bodily harm.
¶ 70. While I do not find that instruction C-7 is at variance with the indictment, I do believe the giving of that instruction was prejudicial error because it told the jury peremptorily that the pool stick, used by Rushing, was a deadly weapon. Further, instruction C-7 had the effect of nullifying Instruction C-8, the lesser-included-offense instruction. For these reasons, I agree with the majority that Rushing's conviction of aggravated assault must be reversed and the case remanded.

The Rape Charge and Evidence in Support of It
¶ 71. The indictment charged that:
JAMES R. RUSHING, a male person over the age of 18 years in said County, on the 3rd day of February, A.D., 1997, did wilfully, unlawfully, and feloniously rape and ravish [the victim], a female person, by forcing her to engage in sexual intercourse with him;
in violation of Mississippi Code Annotated Section 97-3-65 (1972), and contrary to the form of the statute in such cases made and provided, and against the peace and dignity of The State of Mississippi.
The applicable portion of Miss.Code Ann. § 97-3-65 (1972) formerly read as follows:[4]

*1152 Every person who shall forcibly ravish any person of the age of fourteen (14) years or upward, or who shall have been convicted of having carnal knowledge of any person above the age of fourteen (14) years without such person's consent, by administering to such person any substance or liquid which shall produce such stupor or such imbecility of mind or weakness of body as to prevent effectual resistance, upon conviction, shall be imprisoned for life in the State Penitentiary if the jury by its verdict so prescribes; and in cases where the jury fails to fix the penalty at life imprisonment the court shall fix the penalty at imprisonment in the State Penitentiary for any term as the court, in its discretion, may determine.
¶ 72. There is no evidence that Rushing administered any substance or liquid to M.L. without her consent which produced a condition of stupor or imbecility. Hence, if his rape conviction is to stand, it must do so on the basis of his having forcibly ravished (raped) her. There is simply no evidence in this record which will support a finding that Rushing forcibly ravished M.L. It is the province of the jury as the ultimate fact-finder to accord the weight and credibility to the evidence. Neal v. State 451 So.2d 743, 758 (Miss.1984). We may reverse where the evidence is such that reasonable and fairminded jurors could only find the accused not guilty. Wetz v. State, 503 So.2d 803, 808 (Miss. 1987). I believe the evidence is so lacking on the element of force that fairminded jurors could only find Rush not guilty of rape. M.L.'s testimony, along with all favorable inferences which may be drawn from it, just does not make the case. Because I think her testimony argues my point more ably than any words I could choose, I have set forth her testimony in great length.
M.L.'s Direct Testimony
Q. Okay. If you will, tell us what happened when you got back to the trailer on Morgan Road.
A. Well, he was still talking all crazy in the car. And when we got there and parked, I was opening the door to get out and he said, Well I suppose you don't want to f___k now, huh? And I said, Well, you done stomped me, kicked me, beat me and pulled a gun on me, I do not want to have sex with you. And he said, Well, oh, because I kicked you in your p____y, you are too sore to f____k me? And I was about to pass out. I laid on the hood of the car for a minute so I could get myself together. And I went and I made it up the steps and unlocked the door. And when I got in the door, I passed out again. And when I came to, he was pulling me up off the floor. And I made it to the bedroom and I passed out again when I got to the bed. And when I came to, I still had on my blue jeans and it started chaffing my backside, so I pulled them off and put my gown back on.
Q. Why were your blue jeans chaffing your backside?
A. That is where he had done beat me at.
Q. Where were you when you woke up?
A. I was laying across the bed.
Q. Okay.
A. I made it to the bedroom?
Q. I'm sorry.
A. I had made it to the bedroom.
Q. Do you know where he was at that point?

*1153 A. He washe had come in behind. He was in the house.
Q. He was in the house?
A. Uh-huh.
Q. Okay. What did you do after you
A. I was laying down in the bed.
Q. Okay. And how long did you stay in bed, do you know?
A. Well, I stayed there for awhile. Because at first, after I laid down, he put his hands on me and started rubbing on my legs and stuff, I pushed his hand off and told him no.
Q. What kind of manner was he rubbing on your leg?
A. Sexually, like he was sexually. He was just rubbing on my legs and stuff.
Q. So he went from beating you to making a sexual advance to you?
A. Uh-huh.
Q. And then what happened when he started rubbing on you?
A. I pushed his hand back and told him no, and I had turned over on my stomach, because my backside was hurting, and he rubbed on me again. I told him no. He went to sleep. And I got up, I got up to go to the bathroom and I passed out again. I don't know how long I was out, because when I came to, I was still laying on the floor in front of the bathroom door. So I was still I crawled to the bed and laid back up in the bed, and I passed back out.
Q. Do you know whether it was daytime or nighttime when you woke up?
A. When I came back to again, it was just, like, daybreak, daybreak, then.
Q. Daybreak?
A. Uh-huh.
Q. Okay. And you did manage to get back in the bed then?
A. Uh-huh.
Q. How were you feeling at that point?
A. I was hurting. I was hurting real bad. I stood up and, like, my legs would not hold me up. So I crawled to the bed.
Q. Okay. Didn't you say that "Devil Catcher" spent the night there?
A. Yeah, he stayed there.
Q. Did he sleep in that bed?
A. Yes, he did.
Q. Did you want him to stay?
A. I didn't want him to stay, but the house was his. He had keys to the house. There was no way I could have kept him out of there.
Q. Okay. When did you next regain consciousness or wake up?
A. It was the next morning; the phone was ringing. The phone woke me up the next morning.
Q. Okay. And this is later in theyou have already said that it was, like, daybreak when you got back in the bed? This is later in the morning?
A. Uh-huh.
Q. What happened then, if anything?
A. Well, the phone, it was my sister. She had called to wish me a happy birthday. And she asked me what was wrong, I just told her nothing, you know, because she wanted, she wanted to come out there. And I said, no, I am all right, and hung up the phone. The phone rang again and it was my sister again. And I told her, she asked me what was wrong, and I told her nothing I was fine. And so I laid back down and the phone rung again. I didn't get to answer it. And it rung again. It was for my son. So I got up. And it was timewent back there and told him it was the phone, because he had to go to work. He was getting ready to go to work.
Q. Where was "Devil Catcher" during that time?
A. He was still in bed.

*1154 Q. Okay. Why did your sister ask you about if anything was wrong?
A. Because she said I didn't sound right to her.
Q. Okay. Why didn't you tell her that something was wrong?
A. He was laying right there beside me.
Q. Well, let me ask you this. Was there something wrong
A. Yes, it was something wrong.
Q. What did you feel like your options were at that point; what could you do?
A. I just told my sister that I was all right. I didn't want her to come out there.
Q. What were you thinking? What were you thinking that you were going to do at that point?
A. I don't know what I was going to do. I don't know. justlike I said, I didn't want nobody to get hurt. I didn't tell herthat's why I told her that I was all right.
Q. You say you didn't want anybody else to get hurt?
A. Uh-huh.
Q. So in addition to being afraid yourself, were you for other people?
A. Uh-huh.
BY MR. JORDAN: Your Honor, we are going to object to leading.
BY THE COURT: Don't lead your witness.
BY MR. MALTA: Yes, sir.
Q. When, if ever, did "Devil Catcher" wake up?
A. He was woke whenever we woke up. He woke up when the phone started ringing. He woke up when the phone started ringing.
Q. Did he say anything to you at that point?
A. At that point, the first time the phone rang, he didn't. It rang again and he asked me who it was. I told him
Q. What, if anything, did he say or do to you?
A. At that point he didn't do nothing, because the phone got to ringing and kept ringing quite, you know, ringing, ringing one behind the other. Okay. And after that, my son got up and got ready to go to work, and that's when he started making sexual advances again.
Q. This is again that next morning?
A. Uh-huh.
Q. Well, what kind of sexual advances?
A. He started messing with me, started rubbing on me again. And I told him no. And so he kept messing with me and stuff, so I just,you know, he kept on messing me and I told him no. I figured, well, he is not going to leave me alone, so
Q. Let me ask you this question. Did you or did you not
BY MR. JORDAN: Your Honor, I am going to object to him interrupting his own witness.
BY THE COURT: Were you finished with your answer?
BY THE WITNESS No, I wasn't.
BY THE COURT: Go ahead and finish your answer. Sustained. Let her finish her answer.
Q. I didn't mean to cut you off. Finish what you were saying.
A. Okay. And that was at the time I figured out he was not going to leave me alone so I might as well, you know, do what he wanted me to do. All I wanted him to do was leave me alone and leave, but he wouldn't.
Q. Okay. Did you want to have sex with him?
A. No, I did not.
Q. Did you have a favorable response to his sexual advances?
A. I kept telling him no. Well, we did have sex. He kept on messing with *1155 me. And he told me, he said, Well, I don't want you half f__king me. And then he said, You really don't want to do this, do you? I said, No, I don't. He said, Well, if I want to f__k, I am going to have to go somewhere else? I said, Yes, you do. I laid down on the bed. And I laid back down on the bed and he told me, he said, Well, you are going to f__k me before I leave here, even if it's the last time.
Q. What did you do at that point?
A. Well, at that point, I couldn't fight him off or nothing and I did what he wanted me to do.
Q. I hate to make you get graphic, but if you will, tell us what happened?
A. Well, at first, I had oral sex, performed oral sex on him.
Q. Did you want to do that?
A. No. Like I say, the man done beat me half senseless. I did not want to have sex with him; no, I did not.
Q. Okay. After that, what happened, if anything?
A. Well, after oral sex, I got on top of him and we had sex the way we usually do.
M.L.'s Cross-examination Testimony
Q. All right. Now, you get to the house and what happens?
A. When I started to get out of the car, he said, I suppose you don't want to f__k me now. And I told him, no, I did not; You done choked me, pulled a gun on me, beat me; No, I do not want to have no sex with you. And he said, Since, I done kicked in your p____y, you too sore to f____k me. Those were his words. That was in the car.
Q. So you weren't in the caryou were in the car when he said that?
A. Yes, we were.
Q. All right. What conversation was between the two of you driving from the club to the house?
* * * *
Q. Did y'all also have a discussion about you had to go, you had to get out of the trailer, wasn't paying the bills?
A. No. He had told me he wanted me to be out by the week, and I told him fine.
Q. Okay. So we had a discussion on the way back to the house that you wereyou and he, I presume, your relationship was over with; is that right?
A. Uh-huh.
Q. Okay. By the end of the week?
A. Yeah.
Q. All right. You get out of the car and then what happens?
A. I was getting dizzy. I was about to pass out. I laid up on the hood of the car for a minute or two.
Q. Did you pass out?
A. After I got to the door and got in the trailer.
* * * *
Q. Where inside the house did you pass out?
A. Right inside the front door. As I unlockedright inside the door.
Q. Where is James while you are passing out?
A. He was behind me.
* * * *
Q. All right. So you passed out. And then what is the next thing you remember?
A. Him helping me up off the floor.
Q. You are in the front of the trailer or porch or where?
A. In the front door.

*1156 Q. In the front door. Where does he take you?
A. He don't take me nowhere, I gets up and walk to the bedroom on my own.
* * * *
Q. What did you do?
A. I passed out across the bed.
Q. So now you passed out once at the club, twice at home; is that correct?
A. Uh-huh.
Q. Is that right?
A. That's right.
Q. Okay. Then you are in the bed and then what happened?
A. Well, when I came to after that, I pulled my jeans off and put my gown back on.
* * * *
Q. Okay. You are passed out on the bed, you get up, you take your jeans off and put your robe on?
A. Put my gown on.
Q. Kind of a gown/robe combination thing?
A. No, it's just a gown.
Q. Where is James?
A. James is over there on the bed.
Q. Asleep?
A. Yeah, he was asleep then.
Q. He is asleep then. Did you go see Ray?
A. No, I didn't.
Q. Go talk to Ray?
A. No, I didn't.
Q. Did you call your sister?
A. No, I didn't.
Q. Did you call Terry?
A. No, I didn't.
Q. So James is asleep in the bed?
A. Yes, he is.
Q. Okay. Did you call the police?
A. No, I didn't.
Q. Call the sheriff?
A. No, I didn't.
Q. Call anybody?
A. No, I didn't.
Q. So you get up in the bed, I presume, and go to sleep?
A. I said I didn'tyeah, I passed out in the bed. I didn't go to sleep, I passed out.
* * * *
Q. So I presume you woke up; is that correct?
A. Uh-huh.
Q. Got back in the bed?
A. Uh-huh.
Q. James is still in the bed asleep?
A. Uh-huh.
Q. And I assume you stayed there until about daylight the next morning.
A. On the floor when I passed out, I was on the floor until daybreak the next morning.
* * * *
Q. All right. So the next morning about daylight you say you are on the floor?
A. Uh-huh.
* * * *
Q. Okay. All right. Then I presume you get up off the bathroom floor and go where?
A. I laid back down on the bed.
Q. And you got in the bed with James?
A. I laid on the side. I was in the bed first and he got with me.
Q. I didn't hear what you said.
A. I saidyeah, I laid in the bed.
Q. With James?
A. Uh-huh.
Q. He is still asleep?
A. Uh-huh.
Q. Okay. Then what happens?

*1157 A. Well, I laid there until he, when he woke up and
Q. What time did he wake up?
A. I don't remember.
Q. Give me your best estimate.
A. I would say it was around about, maybe around about 9:30, 10:00
* * * *
Q. Okay. Now, you say that sometime that morning you and James or James wanted to make love, have sexual intercourse. What happened? When did that start?
A. When he woke up.
* * * *
Q. All right. So what time did his sexual advances that you now complain about, what time did they start?
A. That was after my son had left.
Q. After your son had left?
A. Uh-huh.
Q. Okay. And he left about 8:00 or 8:30.
A. Uh-huh.
Q. Is that right?
A. Right.
Q. And the power company man was there around 11:00; is that right?
A. Right.
Q. So whatever had happened had already happened at 11:00, when the power company come by?
A. Right.
Q. So everything was completed?
A. Yes. Right.
Q. You had performed oral sex on him and had sexual intercourse with him; is that correct?
A. Right. Uh-huh.
Q. And I believe the position that you and James used that particular morning was you on top?
A. Right.
M.L.'s Redirect Examination Testimony
Q. Okay. Mr. Jordan asked you about the sexual assault on the morning of February 3rd, and he asked you about the position, sexual position that you were in.
A. Uh-huh.
Q. And I believe you told him that you were on top.
A. Uh-huh.
Q. Who had decided that you were going to be on top?
A. Well, we always had sex that way. I was always on top.
Q. Okay. Was it by choice?
A. No, it wasn't. I did not want to have sex with him.
¶ 73. Based on M.L.'s testimony, the most that can be said is that she apparently reluctantly consented at first but actively participated in the sexual encounter. Reluctantly doing something is not one and the same as being forced to do something. At no point did Rushing ever physically persist after being told "no".
¶ 74. The majority quite properly acknowledges that one of the elements of rape is that it must occur without consent and by force. The majority then attempts to explain that the State's proof satisfied this element. The majority, relying on Stewart v. State, 466 So.2d 906 (Miss.1985), reasoned that "proof that Rushing used additional contemporaneous force to have sexual intercourse with M.L. is unnecessary if the evidence establishes that she surrendered because of fear arising out of a reasonable apprehension of great bodily harm." I agree that this reasoning comports with the law in cases such as this. However, M.L.'s own testimony establishes that she consented not out of any apprehension of great bodily harm but out of a realization that Rushing would stick around a little longer until she did what he wanted her to do. The sexual intercourse occurred some six or more hours after the *1158 beating at the club. In the interim, M.L. and Rush had slept in the same bed without incident. It should be noted that when Rushing and M.L. returned to the trailer from the club, Rushing brought up the subject of having sex. M.L. told him she did not want to do so, and he and she both went to sleep. It was not until later that morning when he awoke and started making advances again that she finally agreed to his entreaties. The only logical conclusion, it seems to me, that a fairminded juror could draw is that these two lovers, with a five year relationship, were simply making up, although M.L. had undeniably suffered what had been an unjustifiable and savage beating a few hours earlier. It is hard to extract any other conclusion from M.L.'s testimony in light of how they had sex and her concluding statements: "Well, after oral sex, I got on top of him and we had sex the way we usually do. Well we always had sex that way. I was always on top."
¶ 75. For the reasons stated, I respectfully dissent.
THOMAS, J., JOINS THIS SEPARATE WRITTEN OPINION.
NOTES
[1] Section 97-3-7 was amended effective July 1, 1998. Here, of course, we are concerned with the statute in the form in which it appeared at the time of trial. Nothing in the amendment alters the parts of § 97-3-7(2) construed here.
[2] Section 97-3-65 was amended effective July 1, 1998. The amendment rewrote this section in its entirety.
[3] Inasmuch as Rushing & M.L. had a child together, it appears that an indictment under subsection 3, the domestic abuse provision, may have been more appropriate. That section reads as follows:

A person is guilty of domestic violence who commits any assault against a current or former spouse, an individual with whom the defendant has had a child, or a person living in the same household as the defendant and, upon conviction, the defendant shall be punished as provided under subsection (1) or (2) of this section; provided, that upon a third or subsequent conviction of simple assault which would constitute domestic violence, whether against the same or another victim and within five (5) years, the defendant shall be guilty of a felony and sentenced to a term of imprisonment not less than five (5) nor more than ten (10) years; and upon a third or subsequent offense of aggravated assault which would constitute domestic violence, whether against the same or another victim and within five (5) years, the defendant shall be guilty of a felony and sentenced to a term of imprisonment of not less than five (5) nor more than twenty (20) years.
However, Rushing was not indicted under subsection 3, and this court cannot pass any judgment on the choice of subsection made by the prosecutor.
[4] The applicable portion of Miss.Code Ann. § 97-3-65 now reads:

Every person who shall have forcible sexual intercourse with any person, or who shall have sexual intercourse not constituting forcible sexual intercourse or statutory rape with any person without that person's consent by administering to such person any substance or liquid which shall produce such stupor or such imbecility of mind or weakness of body as to prevent effectual resistance, upon conviction, shall be imprisoned for life in the State Penitentiary if the jury by its verdict so prescribes; and in cases where the jury fails to fix the penalty at life imprisonment, the court shall fix the penalty at imprisonment in the State Penitentiary for any term as the court, in its discretion, may determine.