FAIR, J.,
for the Court:
¶ 1. Jonathan Shotts was charged with animal cruelty after burning his girlfriend's dog, Chloe, while giving it a bath. He said it was an accident. There were no other witnesses, and the attending veterinarian testified that Chloe’s injuries were consistent with Shotts’s account. The county court nonetheless convicted Shotts after suggesting he could be guilty of animal cruelty if he had “carelessly” hurt Chloe. Instead, the 2011 animal cruelty statute, since repealed, required proof beyond a reasonable doubt that Shotts acted maliciously. Since the prosecution failed to meet that burden, we reverse and render Shotts’s conviction.
DISCUSSION
¶ 2. Shotts was prosecuted under Mississippi Code Annotated section 97-41-16(1) (Rev. 2006), which at the time of the alleged offense[1] provided:
Any person who shall maliciously, either out of a spirit of revenge or wanton cruelty, or who shall mischievously kill, maim or wound, or injure any dog or cat, or cause any person to do the same, shall be fined not more than One Thousand Dollars ($1,000.00) or be imprisoned not exceeding six (6) months.
Shotts agreed to a bench trial, and before announcing his decision, the Madison County County Court judge stated:
The charge that has been brought ... is based on the applicable — based on the statute 97-14-16, which is entitled “Malicious or Mischievous Injury to Dog or Cat.” For the record, it states that [“]any person who shall maliciously, either out of a spirit of revenge or wanton cruelty, or .who shall mischievously kill, maim, or wound or injure any dog or cat or cause any person to do the same shall be fined not more. than $1,000 or be imprisoned not exceeding six months.” There’s a distinction! — ]or the statute makes a distinction obviously! — ]between the terms malicious and mischievous.
So the Court took it upon itself to actually look up malicious and mischievous. I think all the [attorneys] know the first thing you do ... is go to Black’s Law Dictionary [ — fit’s been around forever — and look it up. Malicious, which is a little bit easier term, I think, for most of us to grasp, appears to be a willful or more an intentional act. But the dictionary defines mischief as damage — well, one [definition] says damage to property of another, purposely, intentionally, or recklessly. Reckless is defined as careless, inattentive, and indifferent to consequences, and it says according to certain circumstances it may mean wanton or willful or it may mean only careless. I think that the legislature has distinguished ... those two terms, and, once again, I think it’s obvious that they did distinguish them.
*557 Even if mischievously were broader than maliciously, which it is not, the charging affidavit alleged only that Shotts “willfully, unlawfully and maliciously” injured Chloe; he was not charged with mischievously hurting the dog.[2] “The prosecution is held strictly to prove the allegations of the indictment and may not vary from the proof of those allegations unless the variance is a lesser-ineluded[ ] offense.” Rushing v. State, 753 So.2d 1136, 1146 (¶ 45) (Miss.Ct.App.2000).
¶ 3. As to the meaning of “maliciously” in the animal cruelty statute, the Mississippi Supreme Court elaborated in Rembert v. State, 56 Miss. 280, 281-82 (1879):
The affidavit charged the shooting here [of a horse] to have been done “maliciously,” but omitted the words, “out of a spirit of revenge, or wanton cruelty.” Were these words essential? We think not. They are merely descriptive, or by way of definition of the word “maliciously,” as here used: They are parenthetical, and may be wholly omitted without altering the sense. It is just as if the language was: “Any person who shall maliciously, that is to say, either in a spirit of revenge, or wanton cruelty,” etc.
The definition of malicious mischief, at common law, is an injury done to the personal property of another, “either out of a spirit of wanton cruelty, or black and diabolical revenge.” 4 Bla. Comm. 243.
The imputation of cruelty was, of course, applicable only to living things, and not to inanimate property.
The spirit of revenge would ordinarily, though not necessarily, be towards the owner.
In none of the common-law precedents of indictments for malicious mischief do we find an averment of the spirit of *558 revenge, or wanton cruelty; though, as we have seen, these were the elements that made up the offence.
Thus, the supreme court held that although the words “either out of a spirit of revenge or wanton cruelty” may be left out of the indictment, they nonetheless constitute the definition of malicious as used in the statute. Id. at 282; see also Duncan, 49 Miss. at 384.
¶ 4. In Duncan, the supreme court held that one could not be convicted under the statute even if he injured or killed an animal intentionally, unless his actions were also malicious. See Duncan, 49 Miss. at 340 (“[T]he willful and unlawful killing [of a protected animal] would not bring the case within the statute.”) The court cited with approval cases from other jurisdictions where it was held to be a defense that the animal had been killed or injured to prevent it from damaging crops. Id. at 336-39.
¶ 5. If one cannot be guilty of animal cruelty for intentionally injuring an animal without malice, then simple carelessness is clearly not punishable under the statute. “Wanton cruelty” differs from mere carelessness or ordinary recklessness in that “[o]ne who is acting recklessly is fully aware of the unreasonable risk he is creating, but may be trying and hoping to avoid harm,” whereas “[o]ne acting wantonly ... is not trying to avoid [harm] and is indifferent to whether harm results or not.” Black’s Law Dictionary 1719-20 (9th ed. 2009) (quoting Rollin M. Perkins & Ronald N. Boyce, Criminal Law 879-80 (3d ed. 1982)). “Wanton conduct has properly been characterized as ‘vicious’ and rates extreme in the degree of culpability.” Id.
¶ 6. Because the trial judge applied an improper legal standard in adjudicating Shotts’s guilt, Shotts is entitled to, at the very least, remand to the county court for the trial judge to render a verdict under the correct standard. See United States v. Reeves, 752 F.2d 995, 1002 (5th Cir.1985) (“We express no opinion on whether a new trial is necessary, but leave this to the sound discretion of the district court.”).
¶ 7. We do not stop there, however. A thorough review of the record reveals that the prosecution fell far short of proving that Shotts injured Chloe maliciously; the evidence was insufficient to support a guilty verdict even if the proper legal standard had been employed.
¶ 8. For sufficiency of the evidence, “the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.” Bush v. State, 895 So.2d 836, 843 (¶ 16) (Miss.2005) (quoting Jackson v. Virginia, 443 U.S. 307, 315, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)). “[Wjhere the evidence fails to meet this test it is insufficient to support a conviction.” Id.
¶ 9. The prosecution produced only three witnesses. The first, Shotts’s ex-girlfriend, described Chloe as a very small dog, a “Chiffon Brussels Griffon and Shih Tzu mix” weighing three or three and a half pounds. At the time of the incident, Chloe was a little more than a year old. The girlfriend admitted that prior to the incident, Shotts had a good relationship with Chloe; she described how, when he came to visit, Shotts would bring Chloe treats and play with her.
¶ 10. On April 7, 2011, the girlfriend left Chloe at the kennel with Shotts when she went to work. Shotts called around 5 p.m. to tell her that Chloe had been burned while he was bathing her, and some of Chloe’s hair had fallen out. Shotts said it was an accident; he later explained that the water heater had been *559 set too high. After the girlfriend got. off work, she went to check on Chloe and was surprised by the extent of the injury, which she felt Shotts had not adequately described over the phone. She and Shotts then took Chloe to Dr. Gil Green, a veterinarian.
¶ 11. Dr. Green testified next. He explained that Chloe was brought in with the explanation that she had been burned in a bath. Chloe had extensive but superficial burns over the top half of her body. Dr. Green described the burns as nearly all first degree, but there were “some, very few that were like second degree type burns.” Dr. Green noted that Chloe was missing hair over much of the affected area, but he did not ascribe any significance to the hair loss. Dr. Green also observed that, days later, Chloe manifested corneal burns — a superficial injury to the eye that Dr. Green testified was consistent with scalding by hot water. He noted that Chloe’s injuries were not life threatening, that she was not in shock, and that she did not require intravenous fluids. The burn was tender, but Chloe was otherwise “in pretty good spirits” and was “up walking around.” Chloe was treated with pain medication, topical ointment and bandages, and drops for her eyes. She was sent home the first night but was subsequently brought back to be boarded' for approximately one week,[3] and then she required an additional two weeks of treatment at home. Crucially, Dr. Green admitted that all of Chloe’s injuries were consistent with her having been burned in a bath.
¶ 12. A third witness, the ex-girlfriend’s mother, testified very briefly. She had brought the charges against Shotts but did not have any firsthand knowledge of the incident.
¶ 13. After his motion for a directed verdict was denied, Shotts testified in his own defense, and he explained in detail how Chloe was burned. The kennel had a tall tub that was dedicated to washing dogs, but it was more of a shower than a bath. The dog would stand on a perforated platform and be held in place with restraints, while the operator sprayed it with a handheld wand. Water would immediately drain through the platform rather than stand in the tub. Hot water was supplied by a small, “portable” water heater located near the tub.
¶ 14. Shotts put Chloe in place, turned ■the spigots to the usual setting, checked the water temperature with his hand, and began spraying Chloe to wet her as he prepared to apply shampoo. Shotts admitted he was not continuously monitoring the water temperature with his other hand. Approximately twenty seconds after Shotts started spraying her, Chloe cried out, and Shotts noticed the water had become hotter than he expected. Shotts later discovered that someone had raised the temperature setting on the water heater itself.[4] After Chloe’s cry, Shotts stopped spraying and adjusted the water temperature. He did not realize she had been injured until after the bath, when he was drying her and hair in the affected area began falling' out.
¶ 15. In its brief on appeal, the City offers less than two pages of argument on this issue, and most of that is dedicated to the obvious and undisputed fact that Shotts inflicted Chloe’s injuries. As we have explained, the mere fact that *560 Shotts injured Chloe is not sufficient un.less the injury was inflicted with malice, “either out of a spirit of revenge or wanton cruelty.” See Miss.Code Ann. § 97-41-16(1) (Rev. 2006); Duncan, 49 Miss. at 339; Rembert, 56 Miss. at 282.
¶ 16. As to malice, the City makes only a few cursory arguments. It points out that the girlfriend testified that after the incident, Chloe appeared to be afraid of Shotts. But this seems to be offered only to show that Shotts inflicted the injury, and there is no basis in the record to conclude that Chloe’s subsequent wariness of Shotts is proof the injury was inflicted maliciously. The prosecution also makes much of the fact that Dr. Green testified he had never treated another dog burned by bathwater. However, Dr. Green also admitted that, on the day of trial, he had been a practicing veterinarian for less than four years. He did not testify as to how many dogs he saw, how busy his practice was, or anything else that would make his personal experience conclusive or even representative. And while Dr. Green said he had not personally treated another dog that had been burned while bathing, he suggested that it was hardly unheard of; he spoke about the “usual” way dogs get burned in baths. Likewise, Shotts admitted he had not burned another dog before or since. But Shotts did not testify how frequently he bathed dogs, and he had only worked at the kennel for about nine months when he burned Chloe. Dr. Green and Shotts’s experiences were purely anecdotal and not conclusive of anything.
¶ 17. The City next points to a subsequent incident admitted under Mississippi Rule of Evidence 404(b) as evidence of Shotts’s intent. This incident occurred at least three months after Chloe was burned, and Shotts and his girlfriend had moved in together in the meantime. Shotts, while playing with Chloe, put her on top of a tall entertainment center and left her there. According to the girlfriend, Chloe appeared to be frightened and tried to hide under a pillow after being taken down. While this might be taken as an incident of cruelty by Shotts toward Chloe, given its remoteness and comparatively trivial nature, it is not evidence Shotts had maliciously burned her months before.
¶ 18. Finally, the City emphasizes that Shotts himself was not burned, but given the uncontradicted testimony about how Chloe was bathed, this does not seem to be a compelling reason to doubt Shotts’s account. Moreover, the City seems to beg the question of whether a person’s hands and a dog’s back would burn with the same degree of exposure. No evidence was admitted on that question at trial, even though Dr. Green presumably could have answered it.
¶ 19. From our own review of the record, we observe that the prosecution apparently believed Shotts had intentionally burned Chloe through some means other than the bath, even if this theory seems to have been abandoned on appeal. A statement from the ex-girlfriend’s mother, attached (along with fourteen other documents) to the charging affidavit, attributed to Dr. Green the allegation that Shotts had inflicted “chemical burns,” although Dr. Green did not say this at trial.[5] The prosecutor apparently cross-examined Shotts on this point, asking him how Chloe’s eyes could have been injured without her face *561 being burned as well. Shotts replied that he did not spray Chloe in the face while bathing her and that the eye injuries must have resulted from a smaller amount of water inadvertently contacting her eyes.
¶ 20. There was no testimony that the injury to Chloe’s eyes required the same degree of exposure as her skin. Dr. Green himself testified that the eye injuries were consistent with scalding by water. In fact, there was no evidence detailing how hot the water would have had to be, nor how long Chloe would have had to have been exposed, to receive any of the burns. The only testimony addressing that point came on cross-examination, when Dr. Green repeatedly described Chloe’s injuries as consistent with Shotts’s account. We quote some of this testimony verbatim:
Q. And these are burns that could have been caused by scalding? First degree? Superficial?
A. Yes, sir. Yes, sir.
[[Image here]]
Q. And the injuries that are on the pictures that have been introduced in as evidence, the eyes and the back, that could be consistent with a burn that was caused by a dog being im- . mersed in hot water?
A. It could. It could, you know, just depending on how hot it was, but, yes, sir.
Q. So Mr. Shotts telling you he was giving the dog a bath and the water was too hot, that’s not completely out of the blue? Out of left field?
A. No. No, sir.
[[Image here]]
Q. And you said the dog came — when you saw the dog, it was in pretty good spirits?
A. Yes, sir.
Q. Up and moving and something like that?
A. Yes, sir.
Q. So that gave you no reason to believe, nothing to indicate that the dog was anything more serious than what was reported to you that it was burned as it had been immersed in hot water getting a bath?
A. Yes, sir.
The prosecutor was not able to salvage Dr. Green’s testimony on redirect. When essentially asked whether he believed Shotts’s story, Dr. Green said he doubted it, but he could not articulate a clear reason why (emphasis added):
Q. Based on your training and experience and your personal observation and assessment of Chloe, did Mr. Shotts’[s] explanation make sense to you?
A. Not a whole lot just because of the bath, you know, the actual putting the — you know, typically — if I can explain. Usually when we see bathtub burns, it’s putting a dog in hot water and they burn their underside and their feet and things like that and not really the back, and, you know, of course, if it’s coming from above, you know, I would — definitely could be — you know, caused that burn like that if it’s water from above. But also, you know, whoever was bathing the dog would be concerned for their well-being too, you know, if they were burned or whatever, if the water was that hot. But that’s, you know ...
[The prosecutor]: No further questions.
¶ 21. Finally, the dissent cites one last incident relating to Chloe’s ultimate death. The testimony from Shotts’s girlfriend— also admitted under Rule 404(b) — was that months after she was burned, Chloe died, and Shotts admitted he had played roughly with her and their other dogs earlier that *562 day. At the time, Shotts and the girlfriend were living together with Chloe, at least two other dogs, and two roommates. It was insinuated, though never actually proven, that Shotts had killed Chloe or allowed her to be killed by his dog, a sixty-five-pound Labrador Retriever. In fact, even the cause of Chloe’s death was never shown.[6]
¶ 22. The accusation of wrongdoing in Chloe’s death is so tenuous and its admission so dubious that the City has abandoned it on appeal; the City’s brief does not cite it as evidence in support of the verdict and apparently disclaims it.[7] We do not consider it evidence of a malicious motive in her burning months before.
¶ 23. In summary, the prosecution produced only three witnesses: the ex-girlfriend, who testified that Shotts told her the burning was an accident; her mother, who had no personal knowledge of the incident; and Dr. Green. In Tran v. State, 681 So.2d 514, 520 (Miss.1996), our supreme court observed that
if the defendant and his witnesses are the only eyewitnesses to the [offense] and if their version of what happened is both reasonable and consistent with innocence and if, further, there is no contradiction of that version in the physical facts, facts of common knowledge or other credible evidence, then surely it follows that no reasonable [finder of fact] could find the defendant guilty beyond a reasonable doubt. Under such circumstances we have always mandated that peremptory instructions be granted whether under the label Weathersby [8] or otherwise.
(Citation omitted). None of the prosecution witnesses offered any testimony or other evidence that could be reasonably said to show that the burning was intentional or to otherwise contradict Shotts’s account. The girlfriend, who had'actually worked part time at the kennel with Shotts, did not contradict his testimony about the tub or the water heater. She did not ascribe to Shotts any malice toward her or Chloe prior to the incident; on the contrary, she volunteered that Shotts appeared to like Chloe. And Dr. Green, the only witness competent to circumstantially contradict Shotts’s story, repeatedly described it as consistent with Chloe’s injuries. There was no showing that the water would have had to be applied for an excessively long time to produce Chloe’s injuries. Indeed, the fact that nearly all of Chloe’s burns were superficial appears to support Shotts’s claim that he stopped spraying when he noticed the water was too hot. If Shotts had “not [been] trying to avoid [harm]” and was *563 “indifferent to whether harm results or not,” Chloe’s injuries would presumably have been more severe. See Black’s Law Dictionary 1719-20 (9th ed. 2009) (quoting Rollin M. Perkins & Ronald N. Boyce, Criminal Law 879-80 (3d ed. 1982)).
¶ 24. Even considering all of the evidence we have discussed in the light most favorable to the prosecution, a reasonable fact-finder would have to accept that Shotts burned Chloe in the bath, as he claimed. As to whether Shotts burned Chloe maliciously, we recognize that “intent, being a state of mind, is rarely susceptible of direct proof, but ■ ordinarily must be inferred from the acts and conduct of the party and the facts and circumstances attending them.” Jones v. State, 920 So.2d 465, 472 (¶ 17) (Miss.2006) (citation omitted). Likewise, the credibility of witnesses is not for the reviewing court. Renfro v. State, 118 So.3d 560, 564 (¶ 14) (Miss.2013). But that does not relieve the prosecution from its burden of proof beyond a reasonable doubt. The City failed to produce any evidence, direct or circumstantial, from which a reasonable fact-finder could conclude beyond a reasonable doubt that Shotts burned Chloe “maliciously,” that is, “either out of a spirit of revenge or wanton cruelty.” Miss.Code Ann. § 97-41-16(1) (Rev. 2006); Duncan, 49 Miss, at 340. A conviction cannot be founded on insinuation, speculation, or conjecture. Edwards v. State, 469 So.2d 68, 69 (Miss.1985).
¶ 25. It may be fairly said that Shotts was careless, but mere carelessness does not rise to the level of wanton cruelty. Duncan, 49 Miss. at 340; see also Black’s Law Dictionary 1719-20 (9th ed. 2009). We would have reached a different result had there been some substantial “contradiction ... in the physical facts, facts of common knowledge or other credible evidence.” Tran, 681 So.2d at 520. But as the record stands, Shotts’s conviction must be reversed and rendered.
¶ 26. THE JUDGMENT OF THE MADISON COUNTY CIRCUIT COURT IS REVERSED AND RENDERED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLEE.
IRVING AND GRIFFIS, P. J j., ISHEE, ROBERTS AND MAXWELL, JJ, CONCUR. JAMES J., DISSENTS WITH SEPARATE WRITTEN OPINION, JOINED BY LEE, C.J., AND BARNES, J. CARLTON, J., NOT PARTICIPATING.

. About a month after the incident, the Legislature passed the "Mississippi Dog and Cat Pet Protection Law of 2011.” See Miss.Code Ann. § 97-41-16 (Supp.2013). The new statute abrogates the old language entirely, and so our opinion in this case should not be read as bearing upon the new statute.

. The dissent argues that Shotts was charged with mischievously injuring Chloe because the information contains the statement that "DOG[S] AND CATS ARE COVERED UNDER 97-41-16.” Simply mentioning that a code section exists is not a "a plain, concise, and definite written statement of the essential facts constituting the offense charged” that would “fully notify the defendant of the nature and cause of the accusation against him." URCCC 7.06; Havard v. State, 928 So.2d 771, 801 (¶ 60) (Miss.2006); see also Hamilton v. State, 197 So.2d 469, 473 (Miss.1967) (holding that a charging instrument "must present in clear and positive language all the ingredients of the offense of which the accused is charged with such definiteness and certainty as fully to apprise the accused of the nature and cause of the accusation against him and to enable him to prepare to meet it at his trial”).
Moreover, even if Shotts had been charged with "mischievously" injuring Chloe, the prosecution would still have to prove the injuries were inflicted maliciously since "mischievously” in the statute is a term of art referring to the crime of malicious mischief. In Duncan v. State, 49 Miss. 331 (1873), the supreme court addressed an animal cruelty statute with substantially the same operative language as section 97-41-16. The court noted: "Mischievously ... is said to be the generic term, designating the crime of malicious mischief.” Duncan, 49 Miss. at 337 (citation and internal quotation marks omitted). There are "two distinct attributes, conditions, or definitions, of malicious mischief, within one or the other of which the facts must bring a case to warrant prosecution,” which are "that the injury was done 'maliciously, either out of a spirit of revenge or wanton cruelty'; or, that it was done ['jmischievously,' the latter, according to the authorities, being the generic term designating the crime in question.” Id. at 339. Malicious mischief at common law had substantially the same intent requirement as "maliciously” in the animal cruelty statute, but one could not be guilty of malicious mischief for damaging his own property. See Rembert v. State, 56 Miss. 280, 281-82 (1879) ("The definition of malicious mischief, at common law, is an injury done to the personal property of another, ‘either out of a spirit of wanton cruelty, or black and diabolical revenge.' ” (quoting 2 William Blackstone, Commentaries *243)).

. Dr. Green stated that this was “standard procedure” in his office, but he justified it in terms of convenience for the owners rather than medical necessity.

. Presumably, hotter water might have been needed for some other purpose besides bathing dogs, like cleaning the tub.

. Presumably the mother misunderstood Dr. Green when he stated that Chloe had corneal burns. She also overstated the severity of the injuries, describing them as extensive second-degree burns when Dr. Green testified they were almost entirely first-degree. The mother's statement and various other accompanying materials also contain a myriad of other allegations against Shotts that are not relevant to the charges at issue.

. Chloe was necropsied after death, and the result apparently was that she had died of blunt-force trauma. However, the report was never entered into evidence and the trial court did not permit the prosecution to question Dr. Green about it since he had no personal knowledge of the second incident. Shotts testified that he did not know what had happened to Chloe, and that she did not appear to have been injured by his dog while he was present, but he allowed that it was possible.

. Shotts contends this evidence was erroneously admitted under Mississippi Rules of Evidence 403 and 404(b). The City responds in its brief that the admission was harmless: "[T]he Defendant has failed to show through the record that any part of 404(b) evidence was considered by the court in its finding, or that the court relied upon this evidence in anyway in find [sic] that the State had proven its case beyond a reasonable doubt as the court did not elaborate specifically as to what evidence it gave what weight to.” We do not address the merits of Shotts’s argument because he is entitled to an acquittal even assuming the testimony was properly allowed.

.Weathersby v. State, 165 Miss. 207, 147 So. 481 (1933).